**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Michael David Jose WEIL, aka Michael James Gideon, and Stephen Eugene Looper, aka Stephen Lyme, Defendants-Appellees.**

**No. 25594.**

United States Court of Appeals,
Ninth Circuit.

Oct. 8, 1970.

Ann Bowen (argued), Asst. U. S. Atty., Richard K. Burke, U. S. Atty., Tucson, Ariz., Ronald J. Blask, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Frank E. G. Weil (argued), Atty., Washington, D. C., for defendants-appellees.

Before DUNIWAY and CARTER, Circuit Judges, and SWEIGERT,* District Judge.

DUNIWAY, Circuit Judge:

The United States appeals, under 18 U.S.C. § 3731, as amended by Pub.L. 90–351 of June 19, 1968, 82 Stat. 197, 237–38, from an order granting a motion to suppress evidence. The United States Attorney has certified that the appeal is not taken for the purpose of delay and that the evidence is a substantial proof of the charge pending against the appellees' (defendants). We reverse.

The evidence suppressed is certain marihuana concentrate and certain drugs that were found in suitcases in the trunk of a car driven by appellee Looper and in which appellee Weil was a passenger. The search occurred on Arizona State Highway 85, two and one-half miles north of Lukeville, Arizona.

We have recently had occasion to consider another case involving a car that crossed the border at Lukeville. United States v. Kandlis et al., 9 Cir., 1970, 432 F.2d 132. We there described in some detail the town of Lukeville, the surrounding area, the roads, the border and other features of the area. We do not repeat that description here, but we add a little to it. Highway 85 is the only road north from Lukeville. About one mile north from the border, a graded road called Puerto Blanco Drive takes off from Highway 85. It runs west, more or less along the border—at some places as close to it as 20 feet. It does not lead to another town. After about 13 miles, it forks, the left fork continuing westerly to the boundary line of a federal game reserve, the right fork looping around to the north and going ultimately to the headquarters of Organ Pipe Cactus National Monument, a distance of about 51 miles. The Park Service recommends half a day for this scenic loop trip.

The events leading up to the search and seizure were these. At about 1:00 P.M. on August 19, 1969, Looper drove a Plymouth car into the United States from Mexico at Lukeville. Customs Agent Corley found in the trunk one small suitcase and a knapsack, but no contraband. There was a motel key for a motel in Sonora. Looper had a Virginia driver's license in the name of Lyme. The car had been rented at Tucson at 8:00 P.M. on August 18, also in the name of Lyme, but by the use of another person's credit card. Looper said the credit card belonged to a friend in New Jersey. Looper was vague about what he was doing in the area; he said that he was a photographer, but had no photographic equipment with him. The temperature was 108°, and there were very few sightseers in the area. Corley knew that a *modus operandi* of narcotic smugglers was to "fly from distant points to Tucson, Phoenix;[1] rent a car, drive to Mexico, drive around the area.

---

* Honorable William T. Sweigert, United States District Judge, Northern District of California, sitting by designation.

1. There is testimony that Looper was in possession of a round trip airline ticket from Washington, D.C. to Tucson and return, purchased at Washington on August 18. However, it is not clear that this was discovered before the search and arrest, and we therefore do not rely on it.

Later they will make contact, pick up the stuff."

At about 6:10 P.M. on the same day, Corley was at home, some five and one-half miles north of the border, and received a radio message that the Plymouth car had again crossed the border from Mexico. He drove south on Highway 85, but did not see the car. At the border, he was told by Immigration Inspector Walker that the car had crossed with one occupant, the driver, a tall Caucasian person, and that it contained two small pieces of luggage. Corley then drove to the area of Puerto Blanco Drive and waited. In a short time, at about 7:00 P.M., he saw the Plymouth come out of Puerto Blanco Drive and turn north on Highway 85. There were two people in the vehicle. Corley followed it; he also asked, by radio, to have Park Ranger Begeman come to his assistance, which Begeman did. Corley stopped the Plymouth about a mile and a half north of Puerto Blanco Drive. He did so because he "felt that they had picked up something on Puerto Blanco Drive and one person had illegally entered the United States." He asked both persons for identification, which they showed him. He also asked the passenger (Weil) where and when he entered the United States, but got no answer. He asked them to open the car trunk, which was done. He detected a strong odor of marihuana. The trunk contained the two small pieces of luggage that Corley had seen before, and two large tan leather suitcases. A search of those suitcases by Corley and Begeman revealed the contraband concealed beneath false bottoms.

In *Kandlis, supra,* the government made no claim that the search there involved was a border search; it relied upon a claim that there was probable cause for the arrest and search. We held that, under the facts that there appeared, there was not probable cause. In the present case, the government dis-

claims reliance upon probable cause; it claims that the search was a "border search," so that probable cause was not required.

If we take the term "border search" literally, this was not a border search. It did not occur at the border, and the car had already been searched there. Moreover, when the car crossed the border, it contained no contraband. We assume that it was because of these facts that the trial judge held that the search was not a border search and granted the motion to suppress. There is no doubt that the language of some of our decisions supports this result. For example, in cases in which we have upheld a search as a border search, we have emphasized that under the facts it was reasonably clear, by reason of continuous surveillance, that whatever was in the car when it was searched was also in it when it crossed the border. See, *e. g.,* King v. United States, 9 Cir. 1965, 348 F.2d 814; Leeks v. United States, 9 Cir., 1966, 356 F.2d 470; Alexander v. United States, 9 Cir., 1966, 362 F.2d 379; Rodriguez-Gonzalez v. United States, 9 Cir., 1967, 378 F.2d 256; Bloomer v. United States, 9 Cir., 1969, 409 F.2d 869; Castillo-Garcia v. United States, 9 Cir., 1970, 424 F.2d 482. Yet even in such cases, we have not required certainty. Thus in *Alexander, supra,* and *Castillo-Garcia, supra,* there had been a break in the surveillance, but the search was upheld, because it appeared, "with reasonable certainty," (362 F.2d at 382) that the contraband had been in the vehicle when it crossed the border. The language of the opinions in these cases must be considered in the light of the facts to which it relates. In each case, the government claimed that the facts showed that the contraband had been in the vehicle when it crossed the border; in each, that contention was upheld. It does not follow, in spite of rather restrictive language in some of the opinions, that such a showing is the *sine qua non* of a "border search."

■■ It is provided in 19 U.S.C. § 482:

"Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, * * * or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or * * * otherwise, * * *"

In order to avoid conflict between this statute and the Fourth Amendment, the statutory language has been restricted by the courts to "border searches." We must remember, however, that the phrase "border search" does not appear in either the statute or the Constitution. It is merely the courts' shorthand way of defining the limitation that the Fourth Amendment imposes upon the right of customs agents to search without probable cause. The latter right is predicated on the right and obligation of the government, which predate the founding of the Republic, to prevent the importation of contraband or of undeclared, and therefore untaxed, merchandise, and on the universal understanding that persons, parcels and vehicles crossing the border may be searched. See Judge Waterman's discussion of the phrase in United States v. Glaziou, 2 Cir., 1968, 402 F.2d 8, 12–14.

■ It seems obvious to us that the right of customs agents to search a vehicle without probable cause is not confined to vehicles that have crossed the border. For example, if customs agents see a vehicle cross the border, and see the occupant then transfer parcels from that vehicle to another that has not crossed the border, the agents surely have a right to search the latter vehicle. We also think that, if customs agents are reasonably certain that parcels have been (a) smuggled across the border and (b) placed in a vehicle, whether the vehicle has itself crossed the border or not, they may stop and search the vehicle. Similarly, if the agents are reasonably certain that a person has crossed the border illegally, and has then entered a vehicle on this side of the border, we think that they may stop and search the vehicle and person. They can assume that he may have brought something with him.

■ Further than that we need not go in this case. Its facts are different from those in *Kandlis, supra.* Here, the events occurred in summer, when there were few sightseers in the area. Here, there were highly suspicious circumstances when Looper first crossed the border. Here, the elapsed time was much shorter than in *Kandlis,* thus eliminating the possibility that Looper had picked Weil up anywhere but on Puerto Blanco Drive. It would tax credulity to believe that he was, on that hot day, sightseeing on Puerto Blanco Drive while carrying two large suitcases. Here, while there was not a complete surveillance, and while Weil was not seen crossing the border with the suitcases, the surveillance was such as to make it reasonably certain that that is what he did. As applied to the facts of this case, we agree with what Judge Chambers said in his dissent in *Kandlis, supra;* the chances that this is what Weil did are at least 99 in 100, and that is certainly enough.

No case has come to our attention that presents substantially similar facts. But there are cases in which "border searches" were upheld where the person or vehicle searched had not been seen to cross the border. See *e. g.,* United States v. Glaziou, *supra;* United States v. McGlone, 4 Cir., 1968, 394 F.2d 75, 77–78. Some of our own decisions involve a driver who had not crossed the border, but who had taken over a vehicle that had crossed. See *e. g.,* Rodriguez-Gonzalez v. United States, *supra;* Alexander v. United States,

*supra;* Lannom v. United States, 9 Cir., 1967, 381 F.2d 858.

The order appealed from is reversed and the case is remanded for further proceedings.