UNITED STATES of America,
Plaintiff-Appellee,

v.

Samuel Ray PORTILLO, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Rocky Albert RUELAS, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Gilbert Adolph PORTILLO, Defendant-
Appellant.

Nos. 72–1141, 72–1142 and 72–2104.

United States Court of Appeals,
Ninth Circuit.

Nov. 22, 1972.

**908**

Michael A. Lacagnina (argued), Albert D. Noe, of Bilby, Thompson, Shoenhair & Warnock, Tucson, Ariz., W. Edward Morgan (argued), Jack I. Redhair, of Chandler, Tullar, Udall & Richmond, Tucson, Ariz., for defendants-appellants.

David Hoffman, Asst. U. S. Atty. (argued), Stephen McNamee, Asst. U. S. Atty., Wm. C. Smitherman, U. S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before BARNES, DUNIWAY and TRASK, Circuit Judges.

TRASK, Circuit Judge:

We consider three separate appeals arising from the same set of facts, each from convictions of narcotic and marijuana violations under 21 U.S.C. § 841 (a)(1). The district court had jurisdiction under 18 U.S.C. § 3231. Rocky Ruelas was found guilty by the court on evidence adduced on a motion to suppress which was stipulated to be controlling. Samuel Portillo was found guilty in a jury trial and Gilbert in a trial to the court.

At the hearing on the motion to suppress it was developed that on July 29, 1971, at approximately 8:00 p. m., Special Customs Agent Seaver reported for duty at the port of entry at Lukeville, Arizona. He was informed by Customs Inspector Felix that a man by the name of Samuel Portillo had just cleared the port of entry declaring a bottle of tequila and that his name was submitted to the computer (known as CADPIN) and the computer data center reported that the subject (Portillo) was a possible smuggler of contraband into the United States. Agent Seaver was also informed by Felix that the automobile was clean, the driver was the sole occupant and he was driving a 1969 Rambler Ambassador. Agent Seaver and another officer then decided to follow Portillo's car and had it in plain view at a Lukeville gas station. When the Portillo car left the gas station heading north toward Why, Arizona, Agent Seaver allowed the vehicle to get less than one mile ahead before he started out. Nearly immediately, however, Agent Seaver lost sight of the Portillo vehicle. He then proceeded at speeds of up to 100 miles per hour to the town of Why, nearly 28 miles north of Lukeville. During the high speed trip, Seaver was unable to see the Portillo car. The only roads leading off the highway between Lukeville and Why, Arizona are the Organ Pipe National Monument Road and Puerto Blanco Drive. The latter is approximately a mile north of the port of entry and the former approximately 6 miles north of the port of entry.

Agent Seaver then returned south along the highway and maintained surveillance. At about 11:20 p. m., he saw the Portillo Rambler traveling north again at a high speed followed closely by a Ford LTD. Agent Seaver noticed that the Rambler was now carrying more than one person. Seaver then followed the two vehicles passing the Ford to get behind the Rambler until it pulled off the highway at a rest area, where Seaver followed, identified himself to the passengers and conducted a search. With Samuel Portillo in the Rambler were his two brothers, Gilbert and Robert. The search of the trunk of the Rambler revealed no drugs or contraband, but Seaver noted that there was an extra spare tire. Upon a patdown search of the three passengers Seaver found a piece of paper on Gilbert Portillo subsequently identified as the rental agreement on the

Ford LTD. About a minute or two after the search of the Rambler and its occupants, the Ford LTD pulled into the rest area behind the Rambler.

Seaver then approached the driver of the LTD and told him that he wanted to conduct a search for contraband. As he went to the trunk of the car to conduct the search, Seaver noticed an orange package on the seat which looked to him like a brick of marijuana, similar to many he had seen with the same type wrapping. Upon opening the trunk, he found over three hundred pounds of marijuana. Later, the orange package was opened and was found to contain over three pounds of cocaine. Upon discovery of the marijuana all of the defendants were formally arrested.

At trial, Seaver also testified that he had had experience with smuggling in the Lukeville area and that the Puerto Blanco Drive area is notorious for its smuggling activities. He stated that when he saw the Rambler being followed closely by the Ford, it looked to him like a "lead car-load car" situation often found in smuggling operations. He also noticed that the Ford was riding low, although he did not indicate this fact in his report submitted following the search and arrest of all four occupants of the Rambler and Ford.

The district court admitted the evidence obtained from the searches finding that they were justified either as border searches or as searches based upon probable cause. We consider each.

As to the Rambler, it cleared an inspection at the port of entry with a bottle of tequila declared and an unfavorable computer data report that the government admitted at oral argument was unreliable. The agents had the vehicle under surveillance about one-tenth of a mile ahead as it was leaving town but they lost sight of it immediately. A three hour interval elapsed until the

Rambler was again sighted going north at a high rate of speed. The vehicle now contained more than one occupant. It was "followed closely" by another vehicle, although not so closely but what the agent could pass between the two and follow the Rambler to a point 28 miles above the border where it halted, and it and its occupants were searched.[1] Appellees would justify this search as a border search upon the authority of United States v. Weil, 432 F.2d 1320 (9th Cir. 1970), cert. denied, 401 U.S. 947, 91 S.Ct. 933, 28 L.Ed.2d 230 (1971), where we said:

> "We also think that, if customs agents are reasonably certain that parcels have been (a) smuggled across the border and (b) placed in a vehicle, whether the vehicle has itself crossed the border or not, they may stop and search the vehicle. Similarly, if the agents are reasonably certain that a person has crossed the border illegally, and has then entered a vehicle on this side of the border, we think that they may stop and search the vehicle and person. They can assume that he may have brought something with him." 432 F.2d at 1323.

The difficulty with the analogy is that the facts here do not track the facts in *Weil.* There the car was recently rented on a credit card of a person other than the driver; the driver's license was irregular; the driver claimed he was a photographer, but carried no equipment; and the car was coming out of Puerto Blanco Drive, a smuggler's area. Here, Samuel Portillo was driving his own car; there was no suggestion that his driver's license or any other papers were irregular; and there was no evidence that he had been down Puerto Blanco Drive after Seaver had lost him going out of town. Puerto Blanco Drive was one of a number of possibilities, but the vehicle was not observed to have en-

---

1. The "lead car-load car" testimony is also difficult to reconcile with the testimony of Seaver that he had brought his car to a stop in the rest area with the Rambler, identified himself, made a pat- down search of each of its three occupants and looked inside the car and the trunk and was putting down the lid of the trunk before the so-called "tailgating" Ford arrived at the scene.

tered the Drive, to have exited the Drive or to have been upon it. Giving credit to all inferences in favor of the jury verdict, we find nothing in the case against the Rambler or its owner and operator that would justify the search as a border search under *Weil* or any other decision. United States v. Kandlis, 432 F.2d 132 (9th Cir. 1970).

Nor can we justify the search of the Rambler and its occupants on the basis of probable cause. The government relies upon the same factors to establish probable cause that it did to establish a border search. For the same reasons we find those factors inadequate here. The appellee then adds the fact that the Rambler had two more passengers in it when he saw it the second time. But the vehicle had not been under ˙surveillance for a matter of three hours and the passengers were brothers of the driver. There is no factual basis from which a reasonable inference could be drawn that these passengers had entered illegally. Another element added to the evidence on the suppression hearing is that the Rambler when it was again sighted on the highway "was being tailgated by the Ford which was riding low in the rear." This may have been the situation when he observed the vehicles pass him at his surveillance post, but it could not have remained constant. Later, he was able to drive between them, and the Ford must have been some distance behind in order to be so late in arriving at the search point. The testimony, therefore, of the "lead car-load car" smuggling pattern loses much of its conviction on consideration of the actual facts. The rental receipt for the Ford, which Seaver found in the possession of Gilbert Portillo, is not an element of probable cause for search or seizure since Seaver did not know what it was until some time after the arrests.

In short, we find that while Seaver might well have come to a correct result in linking the occupants of the Rambler with the contraband found in the Ford he did not arrive at such a sequel by way of probable cause. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); United States v. Selby, 407 F.2d 241 (9th Cir. 1969). The convictions as to Samuel Portillo and Gilbert Portillo must be reversed. The third Portillo brother, Robert, was not indicted.

The justification for the search and seizure involving the Ford stands on no better legal foundation.[2] Seaver had no information about the Ford or its driver. It was not under observation or suspicion. There was no record that it had come across the border. It had not been seen going into or emerging from the smuggling area along Puerto Blanco Drive. The first time Seaver saw it, the Ford was eight miles north of the border traveling toward Why or Ajo on the principal public highway. There were, therefore, none of the suspicious circumstances connected with it or its driver that were so highly relevant in *Weil, i. e.,* a prior border crossing which developed questionable identifying credentials as to both driver and vehicle; answers and explanations that did not make sense; a second border crossing the same day and time spent in the border area along Puerto Blanco Drive where the suspect picked up another person. None of these indicia of strong suspicion within the *Weil* definition were present here. We find no basis upon which this search can be justified as a border search. Neither is the "plain view" justification available to the officer by reason of the package of cocaine lying on the seat. Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Musgrove v. Eyman, 435 F.2d 1235 (9th Cir. 1971). Seaver testified that he approached the Ford and its driver and told him he was

---

2. Because it was stipulated below that the guilt or innocence of Ruelas would be determined on the evidence adduced on the motion to suppress, we limit our discussion to the same evidence.

going to search the car for contraband before he saw the package on the seat. The package on the front seat in plain view may not be relied upon for a probable cause search under those circumstances. That the Ford was not a suspect car prior to the actual discovery of the contraband is also indicated by the fact that Seaver made no effort to stop the Ford but passed it by to keep behind the Rambler.

 Much is made of the "lead car-load car" smugglers' procedure as justifying probable cause, yet the testimony of Seaver on the suppression hearing indicated that this idea did not occur to him until *after* he had searched the Ford and found the extra tire missing and recalled there being such an additional extra tire in the Rambler.[3] But at this time he was already in the course of searching the Ford and had not been aware of the link between the two in order to justify the commencement of the search on a probable cause basis. In sum, all that Seaver knew about the Ford was that it had not crossed the border at the port of entry and thus, may or may not have ever been in Mexico; that it was traveling fast and in close proximity to the Rambler when the two vehicles passed him, but not later; and that it pulled into the rest area where he and the Portillos were stopped. There was no exchange of greetings between Ruelas and the Portillos shown by the record and no connection between the two cars save the elusive spare tire link which was made after the search had begun. The agent's intuition led him to the jackpot

but not by way of probable cause and even hindsight does not seem to supply it.

The judgment of conviction as to Ruelas is reversed.

---

3. In explaining the application of the "lead car-load car" concept at the suppression hearing, Seaver stated:

   "A. After I found that the Ambassador was clean, and it had the—had the extra spare tire and wheel, and I noticed the way the LTD was riding, I thought that was a lead car.

   "Q. What about the Ford?

   "A. I thought it was the load car. He stopped right behind the Ambassador—and, also, the way it sat, the extra spare tire and wheel in the Ambassador." R.T. at 20.

In explaining the spare wheel and tire in the Rambler as connecting the two vehicles, Seaver testified:

"Q. It was after you searched the Ford that you made the connection of the spare tire belonging to the Ford?

"A. That is correct.

"Q. Up to that point, that spare tire could have belonged to any car in the United States as far as you knew?

"A. Yes, sir." R.T. at 27–28.