**UNITED STATES of America,**
**Appellee,**

v.

**MAJOURAU et al., Appellants.**

**Nos. 72–2307, 72–2344 and 72–2401.**

United States Court of Appeals,
Ninth Circuit.

Feb. 16, 1973.

Jerrold M. Ladar (argued), San Francisco, Cal., Keith C. Monroe (argued), James D. Riddet, George H. Chula, Santa Ana, Cal., Russell E. Parsons (argued), Los Angeles, Cal., Marvin S. Cahn, Judd C. Iversen, San Rafael, Cal., for appellants.

Shelby Gott, Asst. U. S. Atty. (argued), Michael E. Quinton, Donald P. Shanahan, Asst. U. S. Attys., Harry D. Steward, U. S. Atty., San Diego, Cal., for appellee.

Before ELY and TRASK, Circuit Judges, and TALBOT SMITH,* District Judge.

TALBOT SMITH, Senior District Judge:

The defendants before us were charged in two counts with possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Motions to suppress on the grounds, among others, of the "warrantless search of the defendants and their vehicles" were brought and denied.

* Honorable Talbot Smith, Senior District Judge, Eastern District of Michigan, sitting by Designation.

Trial by jury was waived and the cases, consolidated upon motion, tried upon stipulated facts. Upon the conclusion of the trial, all defendants were found guilty on both counts and all have appealed. Among other claimed errors, it is urged that the motions to suppress were improperly denied, since, it is argued, the search here made was neither a border search, nor supported by probable cause. We regard this issue as dispositive of the case.

As to the border search, the appellee-government summarizes from the stipulation as follows:

"In the instant case, Inspector Catalan's suspicions were aroused when the appellants arrived at the Port of Entry at San Luis, Arizona. A search of the vehicle disclosed some wet clothing in the trunk. Further, all of the appellants appeared to be anxious to depart the Port of Entry and the appellant Curtis claimed to be ill but showed no visible signs of illness.

"All of these circumstances were related to Customs Agent Land after the vehicle had been allowed to enter the United States. Agent Land knew from experience with prior narcotics smuggling cases that a common method of smuggling narcotics from Mexico into the United States was by wading or swimming across the Colorado River near the Port of Entry at San Luis, Arizona. For this reason he considered the presence of wet clothing in the car suspicious. In addition Agent Land was aware that an investigation was being conducted on the appellant Rafter concerning his activities in relation to the illegal smuggling of narcotics into the United States.

"All of these circumstances led to a surveillance of the vehicle containing the three appellants being initiated by Agents Ford, Land and Stephenson. The surveillance began about twelve miles north of the Port of Entry at San Luis, Arizona, at a point approximately two to three miles east of the Colorado River, which constitutes the border between Mexico and the United States, and continued to where the appellants were apprehended.

"After beginning the surveillance, the agents observed the vehicle stop at a market in Yuma, Arizona, and the appellant Rafter make a telephone call. The vehicle then proceeded to the Yuma Public Library parking lot where it remained for approximately fifteen minutes. While in the Yuma County Library parking lot, the appellant Rafter got out of the vehicle, walked across the street to an unidentified vehicle, and returned at approximately three minutes, carrying a brown package. The appellants remained in the parking lot for approximately two more minutes and then departed the area. The vehicle was then followed to the point of apprehension."

In addition, appellant Rafter points out certain geographical and chronological facts which do not appear challenged; namely, that San Luis (where entrance occurred) is 25 miles south of Yuma, that El Centro is 60 miles from Yuma, and that the stop and search took place 4 miles north of El Centro. Thus, the travelled distance from border contact to the searching point was between 80 and 90 miles approximately. In addition, the time element between border crossing at 2:00 p. m. and search at 5:00 p. m. was some three hours, which included driving time on the road as well as stops made.

Upon these facts, again we confront the problem of the border search. It has been examined exhaustively in opinions of this and other courts [1] as well as

1. Alexander v. United States, 362 F.2d 379 (9th Cir., 1966) ; Leeks v. United States, 356 F.2d 470 (9th Cir., 1966) ; Rodriguez-Gonzalez v. United States, 378 F.2d 256 (9th Cir., 1967) ; Lannom v. United States, 381 F.2d 858 (9th Cir., 1967) ;

Bloomer v. United States, 409 F.2d 869 (9th Cir., 1969) ; United States v. Jackson, 423 F.2d 506 (9th Cir., 1970), cert. denied 400 U.S. 823, 91 S.Ct. 44, 27 L. Ed.2d 51 (1970) ; Castillo-Garcia v. United States, 424 F.2d 482 (9th Cir.,

the legal periodicals,[2] and we need not here attempt further gloss.

The sweeping statutory authorization under consideration[3] must be reconciled with the requirements of the Fourth Amendment, United States v. Weil, 432 F.2d 1320 (9th Cir., 1970); United States v. Glaziou, 402 P.2d 8 (2nd Cir. 1968). Herein lies the problem, since the controls exercised cannot be confirmed to the precise geographical line of demarcation between the national sovereignties if effective enforcement of the act is to be accomplished. Thus, the restriction by the courts to "border searches," United States v. Weil, *supra*.

■■ We have not, in the past, attempted a delineation of the boundaries of the area within which a border search may be conducted, or any formula of demarcation, if, indeed, such were possible. Rather we have considered in detail the facts of each case, and have stressed, in decision, the "totality of the surrounding circumstances." Alexander v. United States, 362 F.2d 379 (9th Cir., 1966). Fortuitous emphasis upon surveillance in certain of the cases led us to point out recently in the *Weil* case that it is not a *sine qua non* of a valid "border search" that the contents of a car when searched must necessarily have been its contents when it crossed the border (if, in fact, it even did), in view of such devices as the transfer of contraband thereat or near thereto.

■ The government relies heavily upon the *Weil* case, citing it to the argument that search is permissible if the officers "have reasonable grounds to believe that a vehicle in the border area contains a person or contraband that has entered the country illegally." The argument made is far too broad and unjustified by *Weil*. No time limitation is thus expressed and the words "border area" merely restate our problem. That the *Weil* case does not open the door to searches far removed in time or space from the border itself was made clear in United States v. Vigil, 448 F.2d 1250 (9th Cir. 1971), where we cited *Weil* to the point that "The car searched need not have recently crossed the border if it is 'reasonably certain' that it contains goods or persons which *have* just[4] crossed the border illegally" (footnote added; emphasis in original).

■ At the time of the search this car was remote in both time and space from the border. It had not recently, or "just," crossed the border. There was no showing whatever that it contained goods which had just crossed the border illegally. There had been no continuous surveillance. Under the totality of the circumstances, the search was clearly illegal.

Based upon probable cause the search fares no better. Here the government paints with a broad brush, reciting to us chronologically the entire sequence of events from the crossing of the border to the final arrest. Thus, the car crossed from Mexico, it contained wet clothing, and appellants "seemed to be abnormally impatient," a reaction in our judgment not unreasonable in one detained for inspection.[5] Moreover, appel-

---

1970); United States v. Weil, 432 F.2d 1320 (9th Cir., 1970); United States v. Markham, 440 F.2d 1119 (9th Cir., 1971); United States v. Glaziou, 402 F.2d 8 (2nd Cir., 1968); United States v. Almeida-Sanchez, 452 F.2d 459 (9th Cir., 1971), cert. granted, 1972, 406 U.S. 944, 92 S.Ct. 2050, 32 L.Ed.2d 331.

2. 21 Rutgers L.R. 513 (1967); 53 Cornell L.R. 891 (1968); 77 Yale L.J. 1007 (1968); 10 Ariz.L.R. 457 (1968); 8 San Diego L.Rev. 435 (1971).

3. 19 U.S.C. § 482 (1965).

4. Webster's Third International Dictionary, Unabridged (1968) defines "Just" as meaning . . . "but a very short time ago" . . . "very recently." See also, State v. Hinton, 49 La.Ann. 1354, 22 So. 617: " 'Just' as an abverb of time is equivalent to 'at this moment' or the 'least possible time since' . . . ."

5. cf., Pace v. Beto, 469 F.2d 1389 (5th Cir. 1972), an arrest for a traffic offense. "The officer noticed that Pace was very nervous. His suspicions aroused, the

lant Curtis "claimed to be sick," and, in addition Agent Land was told that appellant Rafter was engaged in smuggling contraband. In Yuma, it is added, the appellants made a telephone call, waited in a parking lot and picked up a brown paper bag from another car. Finally, the appellants' car drove in an erratic manner upon leaving Yuma.

These various steps in the journey from border to arrest take on a sinister coloration only upon the theory that a crime has been committed and these are steps in its perpetration. The brown bag, the seeming impatience, the wet clothes, the erratic driving, all add up at the most to mere suspicion. And as to suspicion, the case of Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed. 2d 134 (1959), is clear: "Arrest on mere suspicion collides violently with the basic human right of liberty." [6]

Finally, the government seeks to justify on the ground that the "initial stopping of a vehicle can be justified as a routine investigatory stop by law enforcement officers." The problem here is that this was not a mere routine investigatory stop. The appellants' car had been followed for some 80 or 90 miles in an approximate two-hour period. It is a fair reading of the record that zealous officers were actively seeking suspected contraband.[7] Moreover, customs agents "are not, like local or state police, general guardians of the public peace." They are "customs agents, with duties and powers limited to activities of the type that the title implies." United States v. Jackson, 423 F.2d 506 (9th Cir. 1970); United States

v. Blackstock, 451 F.2d 908 (9th Cir. 1971), dissent at 911. The point is without merit.

Reversed. The search was illegal and upon the mandate going down the indictment will be dismissed.

---

officer first searched Pace's person for weapons." After further discussion of the search, the court commented, "Pace's nervous conduct is not surprising in view of the fact that he had just been arrested, and such conduct by itself could not give rise to probable cause to believe that he had committed any offense other than the traffic violation. cf., Wong Sun v. United States, 1963, 371 U.S. 471, 483, 83 S.Ct. 407, 9 L.Ed.2d 441."

6. The Court is here quoting from Hogan and Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo.L.J. 1.

7. U. S. v. Mallides, 473 F.2d 859 (9th Cir., 1973).