**STATE of Maine**

v.

**Thomas A. GALLANT.**

Supreme Judicial Court of Maine.

July 31, 1973.

Henry N. Berry, III, County Atty., Peter G. Ballou, Asst. County Atty., Portland, for plaintiff.

Francis C. Rocheleau, Westbrook, Edward J. Ridge, Portland, for defendant.

Before WEBBER, WEATHERBEE, WERNICK, and ARCHIBALD, JJ.

WEATHERBEE, Justice.

The Defendant's home in Westbrook was searched by Westbrook police officers by authority of a search warrant which they had obtained largely as a result of evidence disclosed through a search by a U.S. Customs officer of undelivered first class international mail addressed to Defendant. After the mail was delivered to Defendant, his home was searched and heroin was found. The trial Justice in the Superior Court denied Defendant's motion to suppress evidence regarding delivery of heroin to the Defendant and possession of heroin by the Defendant. Later, at jury-waived trial, the same Justice admitted this evidence over the objections of the Defendant. Defendant was convicted of illegal possession of heroin. His appeal urges us that the evidence should not have been introduced at trial.

We deny Defendant's appeal.

Officer Ashley of the Westbrook Police Department received information that the Defendant, a 22-year-old recently returned Viet Nam veteran who was living at his father's home in Westbrook, was a dealer in hard drugs and was receiving shipments of hard drugs through the mails from Viet Nam. He requested the postal inspectors to place a watch on mail coming to the Defendant.

On April 27, 1971 two sealed envelopes from Viet Nam addressed to Defendant arrived in the Westbrook Post Office and were delivered to Defendant's residence. Both were thick and appeared to contain something other than ordinary correspondence. When Defendant took the envelopes from the family mail box he was observed to act in a furtive manner.

A third envelope from Viet Nam addressed to Defendant arrived in the Westbrook Post Office on April 28 and a fourth on April 29. Both of these had been mailed under the free mailing privileges afforded service men stationed in that Republic. Both were marked "Photo.

Do Not Fold", and one was additionally marked "Happy Birthday" although Defendant's birthday was some 4½ months distant.

The Westbrook Postal authorities withheld delivery of these last two envelopes and turned them over to a Special Agent of the Bureau of Customs of the United States Treasury Department on the 29th of April. The Customs officer made a manual examination of the envelopes and found that both appeared much thicker than ordinary mail and that each contained a "slight lump" of some material which was about four inches by five inches in area and a little less than ¼ inch thick. He took these letters to the Customs Building in Portland, and on May 3 he took them to a private laboratory in Wakefield, Massachusetts where the still unopened letters were subjected to radiograph scanning which penetrated the fabric of the envelopes sufficiently to reveal that each envelope contained stapled packets of a powdery substance. The Customs officer then returned to Portland where a United States Magistrate issued a warrant to search the two envelopes. The Customs officer then steamed open the two envelopes in Officer Ashley's presence and found that one envelope contained two packets and the other contained one packet, all three packets filled with a fine white powdery substance. A sample taken from each packet was analyzed at the United States Customs Laboratory in Boston on May 6 and the powdery substance was determined to be heroin hydro-chloride.

The Customs officer returned again to Maine where he took out all but a small quantity of the heroin from each envelope, added cornstarch to duplicate the original bulk, resealed the envelopes and returned them to a Westbrook postman for controlled delivery to the addressee, the Defendant.

After one unsuccessful attempt by the postman to deliver the letters at a time when the Defendant was at home, on May

8 the postman delivered the two letters to the Defendant's home. The area was under surveillance by local police who observed the mail carrier deliver the morning mail (including these letters) to Defendant's father. Defendant's father then handed some of these articles to the Defendant who had been working on a car in the yard and who had immediately left the car to receive these articles from his father. Although the police were not able to identify the articles, they were in fact the letters from Viet Nam. The Defendant took them into the house at once. The Defendant soon returned to the yard but ran back into the house when he saw a police car approaching.

As soon as Defendant had taken the letters into the house, Officer Ashley executed an affidavit which included substantially all the information above recited (except the *details* of the May 8 delivery of the letters) and a Complaint Justice who was waiting nearby issued a warrant authorizing the officer to search the Defendant's home for heroin. The officers searched for, found and seized the heroin and cornstarch. Laboratory analysis again confirmed its illicit nature.

It is the Defendant's contention that the acts of the Postmaster in withholding letters mailed to Defendant and the seizure of these letters by the Customs officer were illegal acts and that the Customs officer's radiographic examination of these letters in Wakefield was an unauthorized and unjustified search. The information which was received as a result of this Wakefield examination, the Defendant says, was fruit of the poisonous tree and, as it apparently formed the basis for the issuance of the federal search warrant which was in turn a necessary part of the basis for the issuance of the Maine search warrant, invalidates the acts of both magistrates and also the search of Defendant's

home. While the Defendant does not dispute that the information in Officer Ashley's affidavit constituted probable cause for the issuance of the Maine search warrant, he urges us that it would be insufficient without the evidence obtained (illegally, he says) by the federal officers and handed by them to Officer Ashley "on a silver platter".[1]

■ As there is no bar to officers of one jurisdiction accepting and using evidence legally seized by officers of another jurisdiction, the sole issue in this case is the legality of the actions of the federal officers.

It is not necessary for us to consider whether the information contained in Officer Ashley's affidavit—exclusive of that obtained through the efforts of the federal officers—would have satisfied the probable cause requirements for a Maine search because we are satisfied that the federal officers proceeded legally in their procedures relating to the envelopes mailed to Defendant.

*Conduct of the Postal authorities in Westbrook*

■ Our attention is called first to the issue of whether the conduct of the Postal officers in Westbrook constituted an illegal seizure of Defendant's envelopes. Federal statutes forbid willful obstruction of the passage of mail (18 U.S.C.A. § 1701), the taking of any letter out of the post office with the design to obstruct the correspondence or to pry into the secrets of another or to open such mail (18 U.S.C.A. § 1702), or the unlawful detaining or opening of any letter entrusted to him by any Postal Service employee (18 U.S.C.A. § 1703).

The Postal officials and employees in Westbrook made no search but, in permitting the Customs officer to take the enve-

1. For a discussion of the silver platter doctrine see Elkins v. United States, 364 U.S. 206, 208 & n. 2, 80 S.Ct. 1437, 1439 & n. 2, 4 L.Ed.2d 1669, 1672 & n. 2 (1960).

lopes sent to the Defendant into his possession, they did detain that mail and obstruct its passage. However, in this action, they were merely cooperating with the Customs officer in facilitating the Customs officer's examination of the letters. The issue really is whether 19 U.S.C.A. § 482 authorized the Customs officer to take possession of the envelopes in the Westbrook post office, which we will later discuss.

In light of the circumstances causing the week and a half detention of Defendant's envelopes, we are not persuaded that such was excessive.[2]

### Was the radiographic scanning a Fourth Amendment search?

■ The keystone of this case is the issue of whether the radiographic scanning under Customs' authority in Wakefield, Massachusetts was lawful conduct under the Fourth Amendment proscription against unreasonable searches. This area of the law delineating the legality of searches has seen a thorough overhauling in recent years, from which has evolved a clearer and more intellectually satisfying understanding of the nature of a search. The issue of whether government action does or does not constitute a search is now understood to depend less upon the designation of an area—that is, home, office, car or telephone—than upon a determination of whether the examination is a violation of privacy on which the individual justifiably relied as secure from invasion. Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583

(1967). Similarly, the means of intrusion has become subordinate to the issue of justified expectation of privacy.

". . . [I]t becomes clear that the reach of that Amendment cannot turn upon the *presence or absence* of a physical intrusion into any given enclosure." (Emphasis supplied) Katz v. United States, supra.

Thus, to discover whether the questioned conduct before us now is a search within the meaning of the Fourth Amendment or whether it is only an authorized Customs border examination of material being introduced into the country but conduct less intrusive than a "search", we must determine whether the person who forwarded the mail from Viet Nam to the Defendant justifiably relied on the privacy of his letter.[3 & 4]

■ What security from invasion of privacy can the person bringing or mailing material into this Country reasonably believe he has? Our examination of the federal decisions convinces us that the right of the government to examine persons and containers entering the country from foreign areas—based, in part, as it is, upon the inherent power of the nation to exclude materials which threaten the public safety—is very broad. The necessity of excluding harmful materials has restricted the rights of privacy of persons entering the country.

■ The action of the Customs officer here in examining Defendant's envelopes is based upon the authority granted by 19 U. S.C.A. § 482.

2. In United States v. Swede, 326 F.Supp. 533 (1971) the United States District Court (S.D.N.Y.) upheld detention of an incoming international letter by Customs agents for a period exceeding one week, citing United States v. Beckley, 335 F.2d 86, 89–90 (6th Cir. 1964).

3. When we speak of a "person's" Fourth Amendment rights, here we are speaking of the person who forwards the mail, that is, the soldier who mailed the envelopes from Viet Nam. However, the Defendant

here has standing to raise the issue under the rationale of People v. Martin, 45 Cal.2d 755, 760, 290 P.2d 855, 857 (1955).

4. We distinguish here the expectancy of privacy vis a vis Customs agents as opposed to the expectancy of privacy vis a vis Postal employees as discussed in United States v. Van Leeuwen, 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed. 2d 282, 284 (1970).

"§ 482. Search of vehicles and persons

Any of the officers or persons authorized to board or search vessels may stop, *search,* and *examine*, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to *search* any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial. R.S. § 3061." (Emphasis added.)

The federal courts appear to agree that this section authorizes a search "of the broadest possible character". Landau v. United States Attorney for Southern District, 82 F.2d 285, 286 (2d Cir. 1936), cert. denied, 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389. It appears to us that it also authorizes an examination of imported material which may be less intrusive than a Fourth Amendment search.

It seems to us that the person entering this Country does so with the expectation that he will probably be required at the border to submit articles which he brings with him to at least an examination sufficient to satisfy the Customs officers that there is nothing suspicious in their nature. How much greater immunity from limited Customs inspection can he reasonably expect by sending his merchandise home by mail rather than by bringing it in his automobile or in his pocket?[5]

Unquestionably the person sending or receiving sealed domestic first class mail has strong expectations of the security of the contents. This was recognized long ago in Ex Parte Jackson, 96 U.S. 727, 733, 24 L. Ed. 877, 879 (1877):

". . . Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. . . ."

But *Jackson* was dealing with domestic mail and it is well established that the policy considerations involved in inspection of mail of foreign origin are not the same. This distinction was emphasized in United States v. Doe, 472 F.2d 982, 985 (2d Cir. 1973) in speaking of fourth class packages:

"Both Congress and the courts have deemed examination of international mail to be on a different footing from that applied to mail moving entirely within the country. . . ."

Such a distinction was also made in United States v. Beckley, 335 F.2d 86, 88 (6th Cir. 1964):

". . . [F]ourth Amendment standards applicable to mail matter moving entirely within the country are not applicable to mail matter coming in from outside the country at least where it appears that a customs determination must be made. . . ."

■ It seems to us unlikely that the authority of Customs officers to protect the

---

5. We know of no treaties or international postal agreements which make first class international mail impervious to the Customs' power under 19 U.S.C.A. United States v. Sohnen, D.C., 298 F.Supp. 51, 54–55 (1969).

public interest from the introduction of contraband into the country is any less in the case of international first class mail than in fourth class mail. We doubt that greater immunity from border inspection for contraband can be purchased by a few additional cents cost of postage. While it appears to us that a person *sending* first class mail into the country may have a reasonable expectation of greater immunity as to his First Amendment rights of privacy in the communication of his thoughts and ideas than a person *bringing* in merchandise, we do not believe he enjoys a more favorable status regarding immunity from limited examination of the contents of his envelopes by methods which neither open the envelope nor disclose his written communications.[6]

We understand the radiographic examination in question to be one in which electronic emanations are projected through the envelope revealing in picture form, by virtue of the density of the resistance they encounter, the shape and, apparently, by movement of the object, the general structure of its bulk. Except for the fact that its operation causes a certain penetration of the fabric of the envelope (as contrasted, for example, with odors recognized while coming *out* of the package), the procedure differs little from those involving a scrutiny of the unopened envelope by use of the physical senses alone.[7] The device requires no opening of the envelope or exposure of any written communications contained within it and no injury to the contents.

■ We are convinced that the sender and receiver of first class letter mail of foreign origin have no reasonable or justified expectation that such mail will not be subjected to some such limited scrutiny for forbidden merchandise as may be had *without opening the sealed envelope or disclosing the private thoughts communicated therein.* In our opinion the use of the device in question by this Customs officer stopped short of being the kind of invasion which must properly be considered a "search".[8]

6. We are not required to decide whether we believe that the rationale of *Doe* and *Beckley* and the force of section 482 would authorize a Customs officer to open and search an incoming international first class letter on reasonable cause to suspect that contraband is enclosed because no such extensive and inclusive intrusion was made in this case until after the issuance of the federal warrant.

7. It seems to us unlikely that courts would hold that some warrantless scrutiny by Customs officers of the contents of sealed letter mail of foreign origin could not properly be made such as by smelling of the envelope, by noting its weight, by judging the shape of its contents from the outside by manual manipulation or by shaking the envelope to hear any sound made by movement of the contents.

8. We have found only two decisions in which the use by Custom officers of a device similar to our own has been under consideration. In United States v. Sohnen, D.C., 298 F.Supp. 51, 53 (1969) Customs officers determined by spectroscopic examination that twelve disk shaped objects were contained inside of a package mailed from Switzerland. On the basis of the information thus obtained the officers searched the defendant's apartment. The court apparently did not feel compelled to discuss whether or not the spectroscopic scanning was a search and accepted the evidence the officers had gained through the examination in determining the validity of the search of the apartment.

In Corngold v. United States, 367 F.2d 1 (9th Cir. 1966) Customs officers operating an electronic scintillator in an apartment house hallway detected emanations from a large quantity of imported luminous watch dials coming out of defendant's apartment, which led them to a later opening of the cartons containing the watches. The court found that this electronic scanning was not a search.

While it is true that in physical operating process the procedure used in *Corngold* differs in a fundamental element from the one now under consideration (in *Corngold* the device operated by picking up emanations coming *out* of the apartment rather than by sending emanations *in*) in practical effect there is little difference. In each case Customs officers seeking to

---

**281**

*If the conduct by the Customs officer was a Customs search, was it an authorized search?*

However, if the Customs officer's examination of the envelopes in question was in fact a search, we believe that it was authorized by section 482 and reasonable under constitutional principles.

19 U.S.C.A. § 482 sets forth the statutory authority for warrantless Customs searches. This authority is sui generis, and has been interpreted and clarified through much application in case law. Courts have found that sound policy considerations support the special treatment which Congress and the courts have given these procedures.

In Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543, 551–552 (1925), Mr. Chief Justice Taft states clearly the rationale of the statute:

"  .  .  .  Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.  .  .  ."

We find that the federal courts have used this rationale in applying the same standards for Customs officials to inspect incoming international packages and mail, for the authorizing statute includes the phrase: "  .  .  .  any trunk or envelope, wherever found  .  .  ." . 19 U.S.C.A. § 482.

"There seems to be no reason why these principles should not apply to mail coming into the country, especially where, as here, there is a representation on the package that it contains merchandise." United States v. Beckley, supra, 335 F.2d at 89.

"  .  .  .  The minor intrusion upon the privacy of international packages must yield to our government's interest in protection of its borders and its revenue." United States v. Doe, supra, 472 F.2d at 984.

Our study of federal decisions satisfies us, first, that the special authority to search granted to Customs officers is intended to apply only to *border* searches. It does not give blanket power to roving Customs officers to make domestic searches for contraband when they are, in time and space, unrelated to entry into the country. United States v. Majourau, 474 F.2d 766 (9th Cir. 1973). But the border search does not need to be made at the precise border line (Murgia v. United States, 285 F.2d 14 (9th Cir. 1960) ) and the courts have extended the border concept inward sufficiently to realistically implement authorized Customs procedure.[9] The border search appears to be a broad concept reaching not only such locations as a Customs station at the border itself, but also to functional equivalents of the border.

In Almeida-Sanchez v. United States, — U.S. —, —, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596, 602 (1973) Justice Stewart, in writing the majority opinion, speaks in dictum to the issue of defining border searches:

"Whatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that ex-

exclude contraband made a controlled limited examination of a closed area without opening the area to general inspection. We are not satisfied that the element of penetration makes an examination a search, ipso facto.

9. "The right of border search is indeed broad, and the border itself is elastic.  .  .  ." Marsh v. United States, 344 F.2d 317, 324 (5th Cir. 1965).

tend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a non-stop flight from Mexico City would clearly be the functional equivalent of a border search."

See also United States v. Arroyave, 477 F.2d 157 (5th Cir. 1973).

■ Customs officials may delay the search of the suspect vehicle until it has reached its destination and "sweep the guilty parties in with the contraband". United States v. Caraway, 474 F.2d 25 (5th Cir. 1973). In other cases it has been held that even if there had been a break in the surveillance, reasonable certainty that the contraband had been in the vehicle when it crossed the border satisfies this requirement of a border search. Alexander v. United States, 362 F.2d 379 (9th Cir. 1966). The vehicle itself need not have crossed if the Customs officers see a transfer of contraband to it from a vehicle which has crossed the border. United States v. Arroyave, supra; United States v. Weil, 432 F.2d 1320 (9th Cir. 1970).

It appears to us that the test of this aspect of a border search stated by Alexander v. United States, supra, 362 F.2d at 382 declares a standard of proof which if met is generally accepted as sufficient:

"Where, however, a search for contraband by Customs officers is not made at or in the immediate vicinity of the point of international border crossing, the legality of the search must be tested by a determination whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of search was aboard the vehicle at the time of entry into the jurisdiction of the United States. Any search by Customs officials which meets

this test is properly called a 'border search'. . . ."

■ A second necessary element of the exceptional authority of officers is "reasonable cause to suspect there is merchandise which was imported contrary to law." 19 U.S.C.A. § 482. Like any other term expressing a quantum of knowledge which is made the prerequisite for some resultant police action, the statute's phrase "reasonable cause to suspect" is evasive of precise definition. Nevertheless, it is clear that it states a standard which is something less than the quantum of "probable cause to believe" which would be necessary to justify warrantless searches and arrests for felonies by other law enforcement officers.

" . . . No question of whether there is probable cause for a search exists when the search is incidental to the crossing of an international border, for there is reason and probable cause to search every person entering the United States from a foreign country, by reason of such entry alone. That the customs authorities do *not* search every person crossing the border does not mean they have waived their right to do so, when they see fit. . . . (Emphasis original)." Witt v. United States, 287 F.2d 389, 391 (9th Cir. 1961).

"The right of a border search does not depend on probable cause. (Citations omitted.) '[The] searches of persons entering the United States from a foreign country are in a separate category from searches generally . . . [and] "are totally different things from a search for and seizure of a man's private books and papers. . . ." ' (Citations omitted.)" Murgia v. United States, 285 F.2d 14, 17 (9th Cir. 1960).

See also United States v. Wright, 476 F.2d 1027 (5th Cir. 1973); United States v. Thompson, 475 F.2d 1359 (5th Cir. 1973); Landau v. United States Attorney for Southern District, supra; Mansfield v. United States, 308 F.2d 221 (5th Cir.

1962). But mere caprice is not equivalent to reasonable cause to suspect. United States v. Duffy, 250 F.Supp. 900, 903 (S. D.N.Y. 1965).

■ Our study of the federal cases satisfied us that it was not intended by the statutory language that a higher standard of proof be required for searches of trunks and envelopes than for vehicles, beasts or persons.[10] This was the conclusion of the Judges of the Second Circuit in United States v. Doe, supra, 472 F.2d at 985, who pointed out that a search of trunks and envelopes is actually less intrusive than a search of the person. They said:

"We see no justification for a construction of the statute which would give customs agents less leeway in preventing importation of mailed contraband than when such merchandise is imported in person."

A third and final necessary element of the special Customs' authority is reasonableness. Although this is an included aspect of "reasonable cause to suspect", it reaches further as a final constitutional limitation on all searches, whether specially authorized or otherwise.

"Border searches are, of course, not exempt from the constitutional test of reasonableness. A true border search, however, is not regarded as unreasonable even though made without probable cause." Marsh v. United States, 344 F. 2d 317, 324 (5th Cir. 1965).

■ We think that the *nature* of the intrusion is a factor which must be weighed in determining the reasonableness of the search; and that, for example, stronger suspicion will doubtless be required for a Customs search of a person's body cavities than would be expected to justify a search where—as here—the intrusion itself was minimal.[11]

■ We are convinced that all three of the above described elements of an authorized sui generis Customs search were present in the case before us.

First, we feel that the location of the interception of the Defendant's envelopes satisfied the principles of border searches accepted by the federal courts. It seems hardly feasible in most instances to segregate and examine envelopes coming to persons under suspicion of importing narcotics by mail anywhere but at the destination post office.[12] And as mail remains in the custody of Postal authorities from the time it enters the country until it is delivered to the addressee, continuity and integrity of condition are virtually assured.[13] We are

10. Section 482 authorizes searches of vehicles, beasts or persons "which they [Customs officers] *suspect*" and searches of trunks and envelopes in which they "may have *a reasonable cause to suspect* there is merchandise which was imported contrary to law". (Emphasis supplied.)

11. In fact, the Judges of the 9th Circuit have held that "mere suspicion" is not enough to justify a "strip search" or a search of the body cavities but that it must "at least be a real suspicion, directed specifically to that person". Henderson v. United States, 390 F.2d 805 (9th Cir. 1967); United States v. Guadalupe-Garza, 421 F.2d 876 (9th Cir. 1970); United States v. Price, 472 F.2d 573 (9th Cir. 1973). They have defined "real suspicion":
"'Real suspicion' justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law." United States v. Guadalupe-Garza, supra, 421 F.2d at 879.

12. In Thomas v. United States, 372 F.2d 252 (5th Cir. 1957) although the defendant had passed safely through a Customs check and had been inside the country an hour and a half when he was observed with suspicion and searched, the second search was held to be a valid border search.

13. In United States v. Cristancho-Puerto, 475 F.2d 1025 (5th Cir. 1973)

convinced beyond a reasonable doubt that the contraband found at the time of the search in the letters mailed to this Defendant was contained in the envelopes at the time they entered the United States. A terminal or destination post office would appear to be a functional equivalent of the border, satisfying the standards of Almeida-Sanchez v. United States, supra, as well as the test under Alexander v. United States, supra.

Second, we believe that the Customs officer did have "reasonable cause to suspect" that the two envelopes contained merchandise which had been imported contrary to law. The Defendant made two attacks upon the validity of the Customs officer's search—first, by moving before trial to suppress the evidence resulting from the search and, again, by objecting to its introduction at trial.[14] His appeal presents both of these claimed erroneous rulings for our consideration (M.R.Crim.P. Rule 37(a)). The facts which support the State's position against the Defendant's two attacks on the search are not identical because the knowledge establishing reasonable cause to suspect presented in the pretrial hearing differs from that information which was brought forward in trial.

The motion to suppress was apparently submitted to the Justice on the basis of Mr. Ashley's affidavit for the Maine search warrant, without testimony. Mr. Ashley's affidavit indicates that the Customs' officer knew that the Defendant had received the two previous envelopes from Viet Nam April 27; that they were thick and appeared to contain something other than ordinary correspondence; that the Defendant behaved in a very furtive manner when he took the envelopes from the mail box; that one of the two envelopes in question arrived on each of the next two succeeding days, mailed from a soldier in Viet Nam; that they were marked "Photo. Do Not Fold"; that one was marked "Happy Birthday" although the Defendant's birthday would not occur for more than four months. The motion to suppress was denied, correctly, we believe.

The Defendant again attacked the validity of the Wakefield search when the State sought to introduce evidence concerning the heroin at trial.

■ Although Officer Ashley's *affidavit* (not presented at trial) indicated that the Customs officer, before the Wakefield search, had been told by the Westbrook Postal employees the circumstances of the Defendant's receiving the previous Viet Nam letters and, although it appears likely that he had been told by the Westbrook police the other circumstances which caused their suspicion that he was receiving hard drugs from Viet Nam, rulings by the Justice severely limited the extent to which the record reflects the Customs officer's information.[15]

---

the defendant landed in Miami on a flight from Columbia and was searched. No contraband was found. He was held in custody and later charged with possession of fraudulent entry documents. After he had been in custody 7 days he was searched in jail by Customs officers and narcotics were discovered in the soles of his shoes which were in his suitcase. It was held that as he had been in custody since his arrival in the country, he "continues to stand at the border for customs and border search purposes."

14. A third point on appeal was waived at argument.

15. These rulings of the Justice were unnecessary and could have been avoided by a timely explanation by the prosecuting attorney of the purpose for which the evidence was offered. We find on direct examination of the Customs officer:

THE WITNESS: I had received information from the Westbrook Police Department that an individual by the name of Gallant had been—was supposed to be receiving mail from—

THE COURT: Well,—

THE WITNESS:—was receiving mail from—

THE COURT: Wait a minute. Are you willing to let the witness testify as to hearsay evidence, Mr. Rocheleau?

The exclusion of this testimony left us with a scanty—but sufficient, we believe—*trial* record as to the extent of the Customs officer's background information concerning the envelopes. We know from his testimony only that he had in his hands two sealed envelopes each mailed from the same soldier in Viet Nam and addressed to Defendant. Each was thicker than ordinary letter mail and contained "a slight hump or lump" about 4 by 5 inches and a little less than ¼ inch thick. On each was written "Photo. Do not Fold". We can assume that the Customs officer, like other citizens, was aware of the importance of Southeast Asia as an origin of importation of illegal drugs into this country.

We are convinced that both the affidavit and the trial record demonstrate, respectively, that the Customs officer was in possession of sufficient information to give him reasonable cause to suspect that the envelopes contained merchandise which had been imported contrary to law.

Third, and finally, we think that the conduct of the Customs officer satisfies the Fourth Amendment mandate that the authorized search be reasonable in every regard. Here, the procedure used by the Customs officer prior to obtaining the search warrant did not go beyond the minimal steps necessary to confirm his suspicions that the envelope contained merchandise which was imported contrary to law. While the examination was more sophisticated than an examination of an envelope which was made only through the use of one's physical senses, the effect of the violation of the Defendant's privacy was no more severe. The envelopes remained unopened, the contents were not damaged and the private thoughts expressed in the enclosed letters were not disclosed to the searcher. It did not violate the international channels of communication of thoughts and ideas.

*Conclusion*

■ A search is prohibited by Fourth Amendment if there is a violation of one's reasonable and justified expectation of privacy. There can be no expectation that mail entering the country will not be subjected to some appropriate scrutiny to protect the public from the introduction of contraband. We believe that the examination made here was such a scrutiny. If this examination was a search we consider that it was made on reasonable grounds to suspect, was properly limited as to the extent of the intrusion and under circumstances of continuity which guaranteed it to disclose whether the envelopes contained material which had illegally entered the country.

In balancing the government's power to exclude contraband (the public's right to

---

MR. ROCHELEAU: No, your Honor.

Q You apparently received some information from the Westbrook Police Department, Mr. Marshall?

THE WITNESS: Yes, sir.

. . . . .

THE WITNESS: The Westbrook Postmaster had these two envelopes in his office and indicated that these were envelopes that were addressed—

THE COURT: Not what he said.

THE WITNESS: All right. I saw these envelopes and we discussed them, and at that point I took the envelopes from him and gave him a receipt for them.

THE COURT: All right.

We are prompted to quote these excerpts because of the frequency in which records before us demonstrate a lack of appreciation that hearsay testimony may be admissible on the issue of whether an officer had probable cause to believe—or, in this case, reasonable cause to suspect—although not admissible on the issue of guilt.

The court in Brinegar v. United States, 338 U.S. 160, 172–173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879, 1889 (1949), did not accept the contention that ". . . The factors relating to inadmissibility of the evidence here, for purposes of proving guilt at the trial, deprive the evidence as a whole of sufficiency to show probable cause for the search . . .", and upheld admission of the hearsay evidence where the issue was probable cause for the search.

be protected) against the right of privacy for people who send first class mail into this country, we feel there are overwhelming policy reasons in favor of permitting the limited examination which was made here.[16] Here, an opposite decision would make the mails a relatively safe conduit for attempting importation of contraband.

Whether we say this is not a search within the meaning of the Fourth Amendment, or whether we say it was a search, but one permitted under section 482, in either case the limited examination before us, conducted by a Customs official, was lawful and the information gained was admissible as information establishing probable cause for the federal warrant authorizing the officer here to open and inspect the contents of these envelopes and, with the information thus gained, was sufficient to justify the issuance of the State warrant authorizing the search of Defendant's home for heroin. There was no error in the Justice's refusal to suppress the evidence relating to the heroin or his refusal to exclude such evidence at trial.

The entry will be:

Appeal denied.

DUFRESNE, C. J., and POMEROY, J., did not sit.

---

16. In Terry v. Ohio, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905–906 (1968) the court undertook a similar approach to the Fourth Amendment proscription against unreasonable searches and seizures, weighing the governmental interest claimed to justify the official intrusion against the constitutionally protected interest of the private citizen.