**UNITED STATES of America,
Appellee,**

v.

**Yves GLAZIOU and Rene L. A. Lemieux,
Defendants-Appellants.**

**No. 319, Docket 31629.**

United States Court of Appeals
Second Circuit.

Argued Feb. 9; 1968.

Decided Oct. 4, 1968.

Certiorari Denied March 3, 1969.

See 89 S.Ct. 999.

Donald F. McCaffrey, Asst. U. S. Atty., Joseph P. Hoey, U. S. Atty., for appellee.

Phylis Skloot Bamberger, Anthony F. Marra, New York City, for defendants-appellants.

Before WATERMAN and FEINBERG, Circuit Judges, and BRYAN, District Judge.*

WATERMAN, Circuit Judge:

This is an appeal by two defendants, French seamen, from a judgment of the United States District Court for the Eastern District of New York entered upon a jury verdict. They had been convicted of having concealed and facilitated the concealment of a large quantity

* Of the Southern District of New York, sitting by designation.

of heroin while knowing that the drug was imported illegally into this country in violation of 21 U.S.C. § 174. Appellant Glaziou was sentenced to fifteen years imprisonment and appellant Lemieux to seven years imprisonment. Both appellants urge that heroin taken from them following an allegedly unconstitutional search of their persons should have been suppressed, that certain evidentiary rulings and the utterance of certain statements in open court by the trial judge were prejudicial errors, and that the trial judge's charge to the jury was prejudicially erroneous in several respects. There is no merit in any of these contentions warranting a determination of prejudicial reversible error, and we affirm the convictions.

The indictment against the appellants charged them with having concealed or facilitated the concealment of 21 pounds, 11.7 ounces of heroin. At a hearing prior to the trial the court suppressed the use as evidence of plastic bags of heroin weighing over 12 pounds, some of which had been discovered in a car rented by Glaziou and some of which had been found on board the ship Le Moyne D'Iberville, upon which Lemieux had been a deckhand.[1] Other plastic bags of heroin weighing more than eight pounds had not been suppressed; these bags had been found on the persons of the appellants. It is the appellants' contention that the bags of heroin found on their persons also ought to be suppressed because they were discovered as the result of an unconstitutional stop and search.

On December 14, 1966, customs officers Ratnofsky and Hogan were on patrol duty along the Brooklyn waterfront. Their assignment was to keep as close a watch over the individual piers as seemed in their judgment to be desirable. At approximately 6:00 P.M. the officers turned onto Atlantic Avenue, a street which deadends at an enclosed dock area between Piers 6 and 7. They parked their car on the Pier 6 side of Atlantic Avenue, facing the piers, a short distance from the dead end of the street. From this point the gate to enclosed Pier 6 could be seen about 100 feet down the street on their right, and the gate to enclosed Pier 7 opposite that of Pier 6 could be observed diagonally across Atlantic Avenue at a slightly greater distance. A few moments later the officers saw two men, later identified as appellants, exit through the gate of enclosed Pier 7 and proceed up the curb on the Pier 7 side of Atlantic Avenue beside the fence enclosing Pier 7. Apparently they were intending to leave the pier area. Although one of the officers knew that the Le Moyne D'Iberville had docked that morning at Pier 7, the officers were not in a position to see whether the appellants had come directly from the ship. The officers drove toward the dead end, made a U-turn, overtook the walking appellants, and parked their car under a lamp post about 40 feet ahead of them. As appellants approached the parked car Officer Ratnofsky got out, displayed his credentials, and told appellants to stop. He then asked Glaziou whether he had a seaman's immigration landing card. Glaziou opened his suit jacket, took out his passport, and with trembling hand give it to Ratnofsky. Ratnofsky then noticed a bulge around Glaziou's waist, reached forward, squeezed it, and felt a lump there. The appellants were ordered into the officers' car. Glaziou's shirt was pulled up and a big white elastic band around his midwaist was disclosed. Ratnofsky pulled up the elastic band and discovered five plastic bags containing a white powder, later identified as heroin. Thereupon Lemieux, who spoke no English, was instructed by sign

1. The trial court determined that the seizure of these suppressed bags of heroin came about as the direct consequence of statements elicited from the appellants by government agents while the appellants were in custody. The court found that at the time the key statements were made the appellants had not been informed of their rights in accordance with the dictates of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and therefore the evidence was inadmissible. Id. at 479, 86 S.Ct. 1602.

language to disgorge whatever he might be secreting, and Lemieux forthwith produced from a similar apparatus three more bags filled with the white powder. Appellants claim that this search was unlawful and the fruits of it, the heroin seized, ought to have been suppressed by the trial court. We do not agree.

■ At the outset two important factors must be noted: the officials involved here are officers of the Bureau of Customs and the search, seizure and arrest occurred beside an enclosed pier at a seaport after the officers had observed the appellants proceeding out from the pier's gate. Both Congress and the courts have long appreciated the peculiar problems faced by customs officials in policing our extensive national borders and our numerous, large international port facilities. E. g., Act of July 31, 1789, 1 Stat. 29, 43; Boyd v. United States, 116 U.S. 616, 623–624, 6 S.Ct. 524, 29 L.Ed. 746 (1889); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); King v. United States, 348 F.2d 814 (9 Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 314, 15 L.Ed. 2d 339 (1965); Alexander v. United States, 362 F.2d 379 (9 Cir. 1966). Realization of customs officials' special problems has resulted not only in the courts' giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officers, see, e. g., Witt v. United States, 287 F.2d 389 (9 Cir.), cert. denied, 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242 (1961); Morales v. United States, 378 F.2d 187 (5 Cir. 1967); but also has resulted in the application of special standards when the legality of a stop, search, and seizure made by a customs official at or near our borders or international port facilities has been challenged. See, e. g., United States v. Berard, 281 F.Supp. 328 (D.Mass. 1968).

■ A customs officer has the unique power to stop a person at an international entry point and to conduct a "border search" without having a search warrant or even having a probable cause to believe the person has committed a crime. Murgia v. United States, 285 F.2d 14 (9 Cir. 1960), cert. denied, 366 U.S. 977, 81 S.Ct. 1946, 6 L. Ed.2d 1265 (1961); Rodriguez-Gonzalez v. United States, 378 F.2d 256 (9 Cir. 1967); Thomas v. United States, 372 F. 2d 252 (5 Cir. 1967); see, e. g., Denton v. United States, 310 F.2d 129 (9 Cir. 1962). Typically, mere suspicion of possible illegal activity within their jurisdiction is enough "cause" to permit a customs officer to stop and search a person. Rodriguez-Gonzalez v. United States, supra; Witt v. United States, supra; United States v. Berard, supra; Thomas v. United States, supra. This is not to say that the restrictions of the Fourth Amendment that searches and seizures may not be unreasonable are inapplicable to border stops and searches conducted by customs officials. On the contrary, border stops and searches, like all stops and searches by public officials, are restricted by the requirement that they be reasonable, see, e. g., Boyd v. United States, supra; Carroll v. United States, supra; Morales v. United States, supra, but what is reasonable, of course, will depend on all the facts of a particular case. E. g., Cooper v. State of California, 386 U.S. 58, 59, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); Boyd v. United States, supra; Carroll v. United States, supra; United States v. McGlone, 394 F.2d 75 (4 Cir. 1968).

■ A customs officer's unique power to conduct a "border search" is coextensive with the limits of our international border areas, and a search and seizure within these areas by a customs officer, reasonable enough under these circumstances, could perhaps be challenged as violative of the Fourth Amendment if conducted by different officials elsewhere. The term "border area" in this context, is elastic, see Murgia v. United States, supra; the precise limits of the border area depend on the particular factual situation presented by the case raising the issue. For our purposes, it need only be said that "border area" reasonably includes not only actual land border checkpoints but also the

checkpoints at all international ports of entry and a reasonable extended geographic area in the immediate vicinity of any entry point.

■ The necessity for an elastic definition of "border area" is well illustrated by the facts presently before us. The appellants would confine the border area, and consequently the customs officers' authority, to that area enclosed by the gates and fences that surround the New York City port facilities. Such a restriction is unreasonable. The locations of fences, gatehouses, and customs offices are dictated by considerations other than the effective enforcement of the customs laws. The needs and development of the seaport's metropolitan area and those of the port facility itself will determine where the fences, gates, and customs offices are placed. To limit the customs officers' authority to the area suggested by the appellants would unduly impair the effective enforcement of the customs laws. United States customs officials must have the unquestioned authority to conduct border searches not only within the enclosed piers of a seaport but also upon the public streets near the piers. See United States v. Yee Ngee How, 105 F.Supp. 517, 520–521 (N.D.Cal. 1952).[2]

■ Even if the officers' authority extended to the area outside the enclosed piers, appellants question whether the customs officers had the right to stop and search them for, though they exited from Pier 7 gate, appellants argue that they were not persons subject to border search because the customs officers had no grounds to believe that they were just entering, or had but recently entered, this country. This objection is not well taken.

■ The class of persons who may be subjected to a border search is not limited to those suspected persons who are searched for contraband upon first entering the United States. Also included in the class are persons who work in a border area when leaving the area, see United States v. McGlone, supra; cf. United States v. Yee Ngee How, supra; persons engaged in suspicious activity near a border area, cf. Lannom v. United States, 381 F.2d 858 (9 Cir. 1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 784, 19 L.Ed.2d 833 (1968); Rodriguez-Gonzalez v. United States, supra; and, in some situations, persons and vehicles after they have cleared an initial customs checkpoint and have entered the United States. E. g., King v. United States, supra; Ramirez v. United States, 263 F.2d 385 (5 Cir. 1959); Murgia v. United States, supra.[3] Therefore, we hold that when an indi-

2. See the identification in United States v. DeFina, 315 F.2d 362 (2 Cir. 1963) of the well recognized extension of the area of a pier to the streets adjoining it.

3. There have been numerous cases upholding stops and searches of vehicles and individuals by customs officials conducted some distance from the border area. In most cases the vehicle or individual received a routine customs check upon crossing the international border or upon otherwise entering the United States; but then, either because of information known at that time ,or upon suspicions aroused as the person or vehicle left the border check, customs agents proceeded to follow the suspect, observe his movements for a short time, and then stop and search the vehicle or person some distance away from the actual border. E. g., King v. United States, 348 F.2d 814 (9

Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 314, 15 L.Ed.2d 339 (1965) (an automobile suspected of carrying amphetamine tablets was followed eight miles from the border and then stopped and searched); Thomas v. United States, 372 F.2d 252 (5 Cir. 1967) (an individual entering the United States on a street car and who answered the description of one who was supposed to be carrying narcotics into the United States from Mexico was followed for one and one half miles and then stopped and searched six blocks from the actual border); Ramirez v. United States, 263 F.2d 385 (5 Cir. 1959) (individuals who displayed nervousness at the time they encountered a customs checkpoint 75 miles from the Mexican border aroused the suspicions of customs officers. Their vehicle was searched and 24 pounds of marijuana were uncovered by the officers); Mansfield v. United

vidual has direct contact with a border area, see United States v. McGlone, supra; Mansfield v. United States, 308 F. 2d 221 (5 Cir. 1962), or an individual's movements are reasonably related to the border area, cf. e. g., Lannom v. United States, supra, that individual is a member of the class of persons that a customs officer may, if his suspicions are aroused, stop and search while the individual is still within the border area. But of course once the individual has left the applicable reasonably defined border area he is not subject to search by customs officials on mere suspicion.[4] See Carroll v. United States, supra; Montoya v. United States, 392 F.2d 731 (5 Cir. 1968); Cervantes v. United States, 263 F.2d 800 (9 Cir. 1959).

In this case, appellants were within the "border area." At the time they were stopped, questioned, and searched, they were walking together on the curb beside the Pier 7 fence and only 200 feet up the street from the Pier 7 gatehouse.

■ The customs officers had observed the two men coming out of the Pier 7 gate at a time when the pier area was apparently deserted. One officer knew that the freighter *Le Moyne D'Iberville* had docked in the morning of December 14, 1966, and, upon arriving in the pier area, he had observed that the French freighter was, in fact, tied to Pier 7. Under these circumstances, the officers were justified in stopping the appellants to investigate further appellants' nocturnal exit from that pier.

Once having stopped appellants, the officers' suspicions were sufficiently

States, 308 F.2d 221 (5 Cir. 1962) (defendant seaman disembarked from his ship and approached the pier gate. There appeared to be a peculiar looking parcel concealed within his coat. The gate guard's suspicions were aroused and he requested the defendant to stand aside until all other disembarking seamen were cleared by the guard and the guard could then search the defendant. Upon searching the defendant, the guard was unable to locate the parcel and released the defendant. After defendant had passed through the gate, the guard observed the defendant bending down and picking up something. The defendant walked to a bar across the street and the guard called customs officials. Customs officers waited until the defendant exited from the bar and upon a search of his person they found 13½ ounces of marijuana).

. The searches in these cases have been classified as border searches under the doctrinal heading of "Extended Border Search."

Of course the authority of customs officers to search an individual after the person has left a border area is more limited than the right of customs officers to search at the actual border. If this were not the case an individual would always be subject to search without probable cause no matter where he was in the United States and no matter how long he had been inside the United States if the search were conducted by the Bureau of Customs. Such a condition would be repugnant to the principles of the Fourth Amendment. See, e. g., Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); cf. Cervantes v. United States, 263 F.2d 800 (9 Cir. 1959). Therefore, the authority to make a valid extended border search depends upon

such factors as the distance of the search from the point where goods could be introduced by the suspect into the United States, the time that has elapsed since the suspect had an opportunity to bring in the goods, and the circumstances upon which the officers base their suspicions. * * * (Footnotes omitted). United States v. McGlone, 394 F.2d 75, 78 (4 Cir. 1968.)

The purpose behind these restrictions is not only that of protecting the privacy of the individual but also that of insuring that the goods discovered upon a search of the person were goods under his control when he entered the United States. See, e. g., Rodriguez-Gonzalez v. United States, 378 F.2d 256 (9 Cir. 1967).

Although many of the principles developed by the courts in the extended border search cases are relevant to the case at hand, the doctrine of "extended border search" is not itself directly applicable, for the area within which Glaziou and Lemieux were stopped, adjacent to the piers, we are holding was an area within which a "border search" was permissible.

4. Absent circumstances which justify an extended border search. See supra, note 3.

aroused to justify the search. When Glaziou and Lemieux were stopped they appeared to be extremely nervous and this heightened the officers' suspicions.[5] Then when Glaziou reached for his passport, Officer Ratnofsky observed the bulge around Glaziou's waist, and this naturally made the officer even more suspicious.[6] Accordingly there were ample grounds for the officer to search Glaziou. Although the bulge around Lemieux's waist was not revealed at the same moment, he was accompanying Glaziou out of the pier gate and up the street and the officers were justified in searching Lemieux as soon as the contraband was uncovered on his companion. See Murgia v. United States, supra.

The initial search which ensued was entirely reasonable under the circumstances. It was limited to touching and squeezing the suspicious bulge around Glaziou's waist. Satisfied that the circumstances deserved further immediate investigation the officers took Glaziou and Lemieux to the officers' car where the appellants removed the heroin in their possession and turned it over. Therefore, we hold that there was no illegal or unreasonable search of the appellants and the stop and search which occurred was permissible under the border search doctrine.

In addition to appellants' objections to the search of their persons and the introduction of the seized heroin at trial, appellants also predicate their request for reversal on a number of alleged trial errors committed by the presiding judge. These alleged errors will be discussed in the order of their occurrence.

First, the court stated to the jury during the *voir dire* that the indictment charged appellants with concealing 21 pounds of heroin and appellants contend that the statement violated their Fourth Amendment rights, was highly prejudicial, and requires reversal of their convictions. One week before the *voir dire* the trial judge had suppressed all but eight pounds of the heroin involved in this case on the ground that the rest had been illegally seized.

An indictment is only an accusation. It is the physical means by which a defendant is brought to trial and its sole purpose is to identify the defendant's alleged offense. Blauner v. United States, 293 F.2d 723, 736–737 (8 Cir. 1961). It is not evidence that the offense charged was committed and may not be considered as evidence by the jury during their deliberations. Blauner v. United States, supra; Holdridge v. United States, 282 F.2d 302 (8 Cir. 1960). In some cases it is true that the reading of the indictment to the jury could result in an overemphasis of the importance of the indictment and consequently could mislead the jurors, United States v. Press, 336 F.2d 1003, 1016–1017 (2 Cir. 1964), cert. denied, 379 U.S. 965, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965) but this was not so here. The judge, immediately upon being informed of his error, instructed the impaneled jurors at the *voir dire* that the indictment was only an accusation and that the jurors should not consider it as evidence that the defendants had committed the offense charged. There was no further reference by trial judge or prosecutor to the suppressed heroin during the trial. The prosecution strictly confined itself to testimony relating to the eight pounds of seized heroin which were not suppressed and which were in evidence as government exhibits. Finally, the judge, in his charge to the jury, reiterated the fact that the indictment was not to be considered as evidence by them in their deliberations.

---

5. Nervousness of an individual has been held sufficient grounds to justify a border search by a customs agent. Ramirez v. United States, 263 F.2d 385 (5 Cir. 1959); Bible v. United States, 314 F.2d 106 (9 Cir.), cert. denied, 375 U.S. 862, 84 S.Ct. 131, 11 L.Ed.2d 89 (1963).

6. A customs officer's observance of a bulge around an individual's waist has been held sufficient grounds for a border search. United States v. Berard, 281 F. Supp. 328 (D.Mass.1968).

It seems highly unlikely that appellants were prejudiced in any way by the court's paraphrasing of the indictment during the *voir dire*. Even if they remembered what the indictment contained the jurors would have attached little significance to the fact that it mentioned 21 pounds of heroin and not just the eight pounds to which the Government's evidence was confined. Furthermore, in view of appellants' defense [7] and the fact that eight pounds of heroin were found in appellants' possession and were observed by the jurors, the court's earlier comment does not constitute reversible error.

Second, appellants predicate error on the trial judge's admission into evidence over defense counsel's objections of testimony relative to the value of this heroin when packaged in 15 milligram glassine envelopes and sold in the New York retail market. The jury was advised that at retail the heroin would bring something over a million dollars. Appellants contend that this evidence was both nonproductive and highly prejudicial.

The statute under which appellants were prosecuted, 21 U.S.C. § 174, provides that:

Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

Appellants took the stand and attempted to explain their possession of the heroin by testifying that they thought the drug was a birth control drug. In sum their testimony was that Glaziou received the white powder from a man he met in a bar in Marseilles, France, about whom he knew little or nothing, not even his last name, or his address, and that that man knew little or nothing about Glaziou. He in turn gave the drugs to Lemieux, about whom Glaziou knew little and the unidentified man in Marseilles knew nothing. In rebuttal, to impeach this testimony, the Government introduced testimony of the high retail value of the heroin found on appellants' persons. The logical inference the jury was invited to make from this evidence was that no one would trust almost complete strangers with that much heroin, and that appellants' story was inherently unbelievable. Appellants claim that this reference to the value of illicitly sold narcotics was of such an inflammable nature as to prejudice unfairly the jurors against appellants.

As a general rule, however, in the trial judge's discretion all facts having rational probative value are admissible in rebuttal unless some specific rule of evidence forbids their admission. See 1 Wigmore on Evidence, 3d Ed. § 10; 3 Wharton's Criminal Evidence, 12 Ed. § 912. In this case the evidence introduced by the Government was rationally connected with the fact which the Government was trying to prove, i. e., that appellants were lying. Evidence of the retail value of a large quantity of smuggled narcotics may unduly excite the emotions of some jurors, but where that evidence is relevant, as here, the trial judge must weigh the probative value of the evidence against its possible prejudicial effect. The trial judge is in the best position to make this evaluation, and, absent an abuse of discretion, his determination should not be upset by a court of appeals. We find no abuse of discretion here.

Third, appellant Lemieux contends that the trial judge's admonitions to his counsel in the presence of the jury prejudiced him and denied him a fair and impartial trial. On several occasions the trial judge interrupted Lemieux's counsel when he was questioning Lemieux, the judge either believing the questions were unnecessary or that counsel was leading the witness. These are the instances

---

7. Appellants' defense was that they did not know that the drug was heroin and that they thought it was a birth control drug.

that form the basis for appellant's contention.

■ The trial record does not disclose that the jurors could have received an impression that the trial judge was partial to one side to the extent that this would have affected their determination of appellants' guilt or innocence. United States v. Guglielmini, 384 F.2d 602 (2 Cir. 1967). Most of the interruptions by the trial judge were justified. In the first cited instance, defense counsel for Lemieux was questioning appellant on a minor point, the location of the French harbor Le Havre, which had been made crystal clear to the jury by earlier questioning of Glaziou and other witnesses. Additional explanation of the location of the harbor was unnecessary and only slowed down the progress of the trial. At the very least, a federal trial judge's control over the conduct of a trial extends to that of directing counsel to avoid unnecessary and repetitious questioning.

Later, when Lemieux was being questioned about his early childhood, the court inquired as to the materiality of the testimony. Counsel responded, in the presence of the jury:

> Your Honor, it concerns his education, his early background, to show that this defendant might not be as bright and sophisticated as the defendant, the other defendant is alleged to have been.

The prosecution immediately objected to counsel's statement. The judge sustained the objection, instructed counsel not to make speeches in the presence of the jury, and told the jury to disregard counsel's remarks. Further, after the judge had sustained numerous objections of Lemieux's counsel to the prosecution's use of leading questions, defense counsel attempted to use leading questions himself. The court sharply warned counsel against continuing such conduct. Although the court's warnings may have been a little stronger than was necessary under the circumstances, surely they were justified by defense counsel's conduct. In any event, it does not appear that these instances of the exercise of judicial control over the course of the trial would have left any indelible impression on the jury's mind that the judge favored, or believed, one side more than the other; or that the defendant was prejudiced in the eyes of the jury thereby.

Finally, the appellants assign error to various portions of the charge the trial judge delivered to the jury.

Appellants first contend that the court's charge explaining the presumption in 21 U.S.C. § 174 was defective in that it failed to inform the jury that they could acquit the appellants even if the appellants illegally possessed the narcotics. Appellants also contend that the charge as well as being incomplete was unduly long and confusing. A reading of the entire charge demonstrates that appellants' points are not well taken.

■ The federal statute involved, 21 U.S.C. § 174, contains a statutory presumption which permits a jury to infer from the mere fact of a defendant's unexplained possession of a narcotic drug that the defendant knew the substance in his possession was a narcotic. United States v. Christmann, 298 F.2d 651 (2 Cir. 1962). The rationale behind this permissive presumption is that the fact of possession is circumstantial evidence from which a jury may rationally infer that the possessor knows what is possessed. See United States v. Peeples, 377 F.2d 205 (2 Cir. 1967). The presumption does not lower the Government's burden of proof; each and every essential element of the charged crime must be proven beyond a reasonable doubt. Of course, circumstantial evidence, if not adequately rebutted, may provide the necessary proof to convict. Essentially, the statute only allows the Government to have its case submitted to the jury; the statute does not authorize the jury to convict unless the jury believes all elements of the crime have been established beyond a reasonable doubt. See, e. g., United States v.

Llanes, 374 F.2d 712 (2 Cir.), cert. denied, 388 U.S. 917, 87 S.Ct. 2132, 18 L. Ed.2d 1358 (1967); United States v. Peeples, supra; United States v. Christmann, supra.

In the instant. case, appellants denied having any knowledge that the white powder substance they concealed on their persons was heroin. If the jury had believed this testimony it would have had to acquit appellants. This vital point was emphasized several times by the trial judge during his reading of his charge to the jury. The jury was aware of the standards to be applied during their deliberations.

■ The charge itself was long but it was not unduly long or confusing. See United States v. Persico, 349 F.2d 6 (2 Cir. 1965). The judge adequately performed his function of providing the jury with guidance by giving statements of the relevant legal criteria and relating the various possible factual determinations which the legal criteria permitted the jury to make. United States v. Persico, supra. The judge did not commit any error by his instructions to the jury on this point.

■ Appellants also complain of the charge to the jury regarding reasonable doubt. The judge charged the presumption of innocence, but in the course of explaining what constituted "reasonable doubt" he stated:

It can even be said that if you find a probability of innocence reasonable, that then you are entertaining a reasonable doubt as to that defendant's guilt.

Relying on this court's decision in United States v. Guglielmini, 384 F.2d 602 (2 Cir. 1967), appellants contend that this portion of the charge constituted reversible error. We do not agree.

The use of the phrase "probability of innocence" is to be discouraged, since it, in some circumstances, may result in the jurors' believing that the defendant has the burden of proving his innocence or may result in lowering the Government's burden of proving guilt below that of proof "beyond a reasonable doubt." United States v. Guglielmini, supra at 606–607. However, we do not believe that the phrase could have had either effect in this case. A full and complete reading of the court's instructions to the jury regarding reasonable doubt shows that the court made the jury fully aware of the proper standards to be applied despite the quoted sentence.

The Guglielmini case is not controlling in this case. In Guglielmini many trial errors were committed both by the trial judge and by the prosecution, in addition to the possibly misleading charge. The court in Guglielmini held that the cumulative effect of all the trial errors cast serious doubt on the fairness of the whole trial. Though indicating that the phrase should not be used in charges in the future the court did not hold that the use in a charge of "probability of innocence," unexcepted to by trial counsel, constituted reversible error unless that error, together with other errors, resulted in an unfair trial. United States v. Guglielmini, supra at 607.

Appellants have raised a number of other claims of trial error which they contend are prejudicial and are grounds for reversal of the convictions. We have examined all of these and we find that they lack merit and do not warrant discussion. We do not find that the sum of the claimed errors requires a determination that these appellants received an unfair trial, and accordingly their convictions are affirmed.