**UNITED STATES of America**
**v.**
**Robert William MURRAY and Robert Joseph Beck.**
**Nos. 72–259, 72–260.**

United States District Court, E. D. Pennsylvania.

Dec. 12, 1972.

As Amended March 26, 1973.

Robert E. J. Curran, U. S. Atty., by Carmen C. Nasuti, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Edward Weis, Defender Association of Philadelphia, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

CLIFFORD SCOTT GREEN, District Judge.

Presently before the court are defendants' appeals from judgments of convictions before a United States Magistrate on a complaint charging theft [1] from a shipment moving in international or interstate commerce in violation of Title 18 U.S.C. § 659 which provides in relevant part:

> "Whoever embezzles, steals, or unlawfully takes, . . . with intent to

---

[1]. Mr. Murray was charged with taking nine lighters, twelve knives, a set of stainless service and a tape recorder.

Mr. Beck was charged with taking ten knives, seven fly reels, a set of stainless service. This merchandise had been transported to the United States from Japan by the M/V Leersum, a common carrier.

The Government stipulated that the merchandise in question did not exceed the value of One Hundred Dollars and therefore the case fell within the jurisdiction of the United States Magistrate's Court. See 28 U.S.C. § 636(a)(3) and 18 U.S.C. § 3401.

convert to his own use any goods . . . which are a part of . . . foreign shipment . . . shall be fined not more than $1000 or imprisoned not more than one year or both."

The Magistrate denied defendants' motions to suppress as evidence the allegedly stolen articles and held the challenged search and seizure valid as meeting the requirements of a "border search." We decide that under the facts and circumstances of the instant case, the search and seizure were unreasonable, and not in accordance with the dictates of the Fourth Amendment, and accordingly the evidence should have been suppressed.

In the case at bar, we are faced with the delicate task of balancing the federal government's interest in effective law enforcement against the individual's right to be free from "unreasonable searches and seizures." The evidence viewed in the light most favorable to the government does not support a finding that the search and seizure were reasonable under the circumstances, as required by the Fourth Amendment.

On April 16, 1972, the vessel M/V Leersum was unloading cargo at Pier 80 in Philadelphia.[2] Between 4:00 and 4:15 P.M. on the aforementioned date, Customs Agents Harrison and Friedrich at a distance of approximately 150 yards from the pier gate, observed defendants Murray and Beck leaving the pier carrying blue tote bags. Agent Harrison testified that the bag which defendant Beck carried in his left hand appeared heavy because his arm hung straight down and did not swing back and forth. Because both Murray and Beck were wearing gray helmets, Agent Harrison identified them as watchmen. The agents observed the defendants place the tote bags on the rear floor of a white 1966 Ford, throw their helmets on the back seat, and drive away. The agents immediately followed and subsequently stopped them on Water Street, a distance of about one-half mile away from the pier. Agent Friedrich immediately searched the trunk of the car driven by Murray but did not find any contraband. Agent Harrison searched Beck's tote bag and found the articles referred to in the complaint; Murray's bag was likewise searched by the agents, and it also contained items which were later determined to have been stolen. The agents then searched the interior of the car and found additional stolen merchandise.[3] Defendants were then placed under arrest. The agents returned to the pier to look at the bonded locker and the next day learned for the first time that the articles seized from defendants had been removed from cartons within the bonded area. A check of the manifest and entry documents of the M/V Leersum indicated the articles in the tote bags were carried by that ship. The evidence supports a finding that the merchandise was stolen from an international shipment.

The evidence also reveals that the customs agents did not have any report of merchandise stolen from any interna-

---

2. Pier 80 in Philadelphia is desginated as "an international area." Some of the goods unloaded from foreign vessels are termed "bonded", i. e., since no duty has been paid, the goods are in the legal custody of the United States Government.

3. At the trial, the witnesses were sequestered and Agent Harrison testified first. The testimony of Customs Agents Harrison and Friedrich differed in at least one material respect. Agent Harrison's testimony suggests that defendants were stopped so that the bag carried by Beck could be searched. Agent Friedrich testified, "My partner, I believe, at this time found some fish hooks on the possession of Mr. Beck *which caused my partner to further investigate the bag* . . . ." (N.T. p. 26) (Emphasis added). Also, we note that the search by Agent Friedrich of the trunk of the car before a search was made of Mr. Beck's tote bag, is conduct inconsistent with a decision to stop defendants to investigate the appearance of the tote bag. We assume the Magistrate was able to reconcile the conflicts in the testimony of the government witnesses and on appeal, we view the evidence in the light most favorable to the government.

tional shipment at the time of the search, seizure and arrests. The search in question was conducted without a warrant and without the consent of the defendants.

On April 20, 1972, both defendants waived their right to trial in the United States District Court, and elected, as was their right, to be tried by the United States Magistrate. Defendants moved that the seized evidence be suppressed on the ground that it was the fruit of an unconstitutional search and seizure. The Magistrate concluded that the search met the requirements of a valid "border search" and denied the motion to suppress. The Magistrate found each of the defendants guilty as charged, and sentenced each to pay a fine of One Hundred ($100.00) Dollars. It is from this judgment of conviction and sentence that defendants have prosecuted this appeal.[4]

On appeal, defendants contend that their motion to suppress the evidence seized by the customs agents should have been granted. In support of this contention, defendants assert the following grounds: First, the search undertaken by the customs agents was not a border search, and therefore probable cause was required; second, they contend that even if the search is classified as a border search, the customs agents did not have reasonable suspicion to believe that defendants were violating customs laws. The government concedes that the search can only be sustained if it is classified as a "border search."

Because a "border search" must be in accord with Fourth Amendment requirements, we believe that determining the search and seizure to be reasonable under the circumstances is the essential standard for constitutional validity and not merely applying a label of "border search." One of the basic constitutional protections is that against unreasonable searches and seizures. The Fourth Amendment of the United States Constitution provides that:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

■■ Evidence which is acquired in violation of the Fourth Amendment is excluded by both federal[5] and state courts.[6] Evidence must be the product of a reasonable search and seizure if it is to be admissible. The Supreme Court has held that a reasonable search with or without a warrant must be based on probable cause.[7] However, it is well established that border searches are in a separate category from searches generally. Because of the peculiar and difficult problems associated with policing our national boundaries, Congress has granted customs officials extensive statutory authority to stop and search any persons or vehicles suspected of carrying illegally imported merchandise into

4. This appeal has been properly brought to this court pursuant to 18 U.S.C. § 3402 which provides:

"In all cases of conviction by a United States magistrate, an appeal of right shall lie from the judgment of the magistrate to a judge of the district court of the district in which the offense was committed.

"The Supreme Court shall prescribe rules of procedure and practice for the trial of cases before magistrates and for taking and hearing of appeals to the judges of the district courts of the United States."

Rule 8(d) of the Federal Rules of Procedure for the Trial of Minor Offenses

before United States Magistrates provides:

"The defendant shall not be entitled to a trial de novo by the judge of the district court. The scope of appeal shall be the same as an appeal from a judgment of a district court to a court of appeals."

5. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

6. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

7. Carroll v. United States, 267 U.S. 132, 161, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

the United States and to seize any merchandise that they have reasonable cause to believe has been illegally imported. 19 U.S.C. § 482.[8]

■ Border searches like all searches by public officials must be reasonable. United States v. Hill, 430 F.2d 129 (5th Cir. 1970); United States v. Poindexter, 429 F.2d 510 (5th Cir. 1970); United States v. Tsoi Kwan Sang, 416 F.2d 306 (5th Cir. 1970); Walker v. United States, 404 F.2d 900 (5th Cir. 1968); United States v. Glaziou, 402 F.2d 8 (2nd Cir. 1968); cert. denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1968); United States v. McGlone, 394 F.2d 75 (4th Cir. 1968); Morales v. United States, 378 F.2d 187 (5th Cir. 1967); Thomas v. United States, 372 F.2d 252 (5th Cir. 1967); King v. United States, 348 F.2d 814 (9th Cir. 1965), cert. denied, 382 U.S. 926, 86 S.Ct. 314, 15 L.Ed. 2d 339 (1965); Marsh v. United States, 344 F.2d 317 (5th Cir. 1965).

■ The traditional type of situation which the courts have labelled "border search" involves searches by customs agents at an international entry point. Persons such as foreign seamen or international travelers who are about to enter the United States belong to a class which may be routinely searched. The very fact of entry into the country is sufficient to satisfy the reasonableness requirement of the Fourth Amendment.[9] In the instant case, there is no evidence that defendants had just entered the country; however, we recognize that the courts have not limited the "border search" doctrine to cases where recent border crossings are proved. The courts have labelled searches conducted by customs agents at locations geographically removed from the border as "border searches" or "extended border searches", and it is well settled that proof of a border crossing is not the sine qua non of a border search. Persons and vehicles in and about the border area may be the proper subjects of a search by customs agents if there is direct contact with or some reasonable relationship of said persons or vehicles to the border area, and the search is reasonable under the circumstances. United States v. Hill, supra.

In support of their contention that once a person has passed through cus-

8. 19 U.S.C. § 482 provides as follows:
"Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well as without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charged, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

See also 19 U.S.C. §§ 1581, 1582, and 19 C.F.R. § 23.1(d).

9. In considering searches directly at the border, in Carroll v. United States, supra, (note 7), the Supreme Court in the course of its opinion stated:
"Travelers may be so stopped in crossing an international boundary, because of national self-protection, reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." 267 U.S. at 154, 45 S.Ct. at 285.
In Witt v. United States, 287 F.2d 389, 391 (9th Cir. 1961), cert. denied, 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242 (1961), the Ninth Circuit Court of Appeals declared:
"No question of whether there is probable cause for a search exists when the search is incidental to the crossing of an international border, for there is reason and probable cause to search every person entering the United States from a foreign country, by reason of such entry alone."

toms or if a person has never left the United States, his car can never be stopped and searched without probable cause, defendants direct our attention to dicta in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *Carroll,* supra, the Supreme Court recognized that once a traveler's entry into the country becomes complete, he is entitled to the full safeguards of the Fourth Amendment. The Court noted in this regard that:

> "those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." 267 U.S. at 154, 45 S.Ct. at 285.

Consistent with this proposition in *Carroll* is the rationale in United States v. Yee Ngee How, 105 F.Supp. 517, 523 (N.D.Cal.1952), where the district court said that once a person or vehicle had passed through a customs barrier located at some fixed position between the international border and the internal public streets of the United States, probable cause would be necessary to justify the search. Because the search in the instant case took place a half mile from the pier, this rationale would appear to lend support to defendant's contention. However, it is not always practical or realistic to restrict customs searches to the boundary line or "barrier" itself. Ramirez v. United States, 263 F.2d 385 (5th Cir. 1959). Clearly, customs laws would be frustrated if customs agents were not allowed to search persons about

whom they had the requisite amount of suspicion, merely because such suspects managed to slip away or escape into our public thoroughfares. The "border area" is elastic, Murgia v. United States, 285 F.2d 14 (9th Cir. 1960), and "reasonably includes not only actual land border checkpoints but also the checkpoints at all international ports of entry and a reasonably extended geographic area in the immediate vicinity of any entry point." United States v. Glaziou, supra, 402 F.2d at 12–13.[10]

In light of the foregoing discussion, the court is of the opinion that the instant search may be characterized as a "border search"; however, we limit the significance of the "border search" label to considering the proximity of the search to the border area as one of the factors properly to be considered in determining the reasonableness of the search. The border search designation standing alone does not make the search reasonable and in conformity with the Fourth Amendment requirements.

Defendants advance the argument that even if the present search is a "border search", it is nonetheless invalid since the Fourth Amendment requirement of reasonableness has not been satisfied. We agree. At one time in determining the "reasonableness" and validity of border searches, the courts considered the remoteness of the search from the international border as the most significant factor. See, Cervantes v. United States, 263 F.2d 800 (9th Cir. 1959); Contreras v. United States, 291 F.2d 63 (9th Cir. 1961); Plazola v. United States, 291 F.2d 56 (9th Cir. 1961). However, because of the necessity to prevent the smuggling of narcotics and oth-

10. In United States v. Glaziou, supra, the court emphasized:

"The locations of fences, gatehouses, and customs offices are dictated by considerations other than the effective enforcement of customs laws. The needs and development of the seaport's metropolitan area and those of the port facility itself will determine where the fences, gates, and customs offices are placed. To limit the customs officers' authority to the area . . . [within the barrier] would unduly impair the effective enforcement of the customs laws. United States customs officials must have the unquestioned authority to conduct border searches *not only within the enclosed piers of a seaport but also upon the public streets near the piers.*" 402 F.2d at 13. (Emphasis added).

er contraband, the courts took steps to minimize the emphasis on the proximity of the search by customs officials to the border. As a result, alternative criteria and standards were developed in subsequent court opinions,[11] with respect to "extended border searches."[12] In the Ninth Circuit, customs officials have the right to search vehicles without probable cause at a distance far removed from the border, if customs agents are 'reasonably certain' that parcels have been smuggled across the border and placed in a vehicle, whether or not the vehicle (or person) has crossed the border. United States v. Weil, 432 F.2d 1320 (9th Cir. 1970), cert. denied, 401 U.S. 947, 91 S.Ct. 933, 28 L.Ed.2d 230 (1971). In the Fifth Circuit, the validity of an extended border search is dependent upon whether the circumstances known to the customs agents amount to a "reasonable cause to suspect that a violation of the customs law is taking place". Marsh v. United States, supra; Valadez v. United States, 358 F.2d 721 (5th Cir. 1966).

The courts in the respective circuits understandably have avoided creating any precise formula for determining the validity of border searches conducted at distances removed from the border. The standards applied in the border search cases seem somewhat confused and inconsistent. However, it is very evident that in all those cases where the searches were upheld, they were found to be reasonable under the circumstances, regardless of the respective standards or tests stated by the courts. In this regard, we think it appropriate to quote from United States v. McGlone, supra, 394 F.2d 75

at 77–78, where Judge Butzner stated, inter alia:

"This term [border search] is simply descriptive. Regardless of its label, the *standard for a search by customs agents, as for any search, is the constitutional requirement of reasonableness,* and, as Mr. Justice Black recently emphasized in Cooper v. State of California, 386 U.S. 58, 59, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967), '. . . [W]hether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case . . . .'" (Emphasis added).

■ In deciding whether the search in the instant case is reasonable under the circumstances, we must determine whether all the facts and circumstances established a reasonable basis for the officers to believe that contraband or goods subject to customs control were being introduced into the United States in a manner contrary to customs laws, by the persons the customs agents proposed to search. United States v. Maggard, 451 F.2d 502 (5th Cir. 1971); United States v. Tsoi Kwan Sang, supra; Stassi v. United States, 410 F.2d 946 (5th Cir. 1969); Walker v. United States, supra, United States v. McGlone, supra; Morales v. United States, supra; Willis v. United States, 370 F.2d 604 (5th Cir. 1966); Valadez v. United States, supra. Thus, we examine the facts and circumstances known to the customs agents at the time of the search. United States v. Garcia, 452 F.2d 419 (5th Cir. 1971); United States v. Glaziou, supra; United States v. Mc-

---

11. The courts in the Fifth and Ninth Circuits have been deciding most of the border search cases since their jurisdiction covers most of the area contiguous to the Mexican border which is the locale of an enormous amount of narcotics smuggling.

12. These searches are typically preceded by surveillance and the searches were not conducted at the authorized border stations either because the suspect had not been identified until after he had cleared customs

or because the agents wished to apprehend his accomplices inside this country. Morales v. United States, 378 F.2d 187 (5th Cir. 1967); Lannon v. United States, 381 F.2d 858 (9th Cir. 1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 784, 19 L.Ed.2d 833 (1969); Rodriquez-Gonzalez v. United States, 378 F.2d 256 (9th Cir. 1967); Alexander v. United States, 362 F.2d 379 (9th Cir. 1966), cert. denied, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966).

Glone, supra, Alexander v. United States, supra, 362 F.2d 379, note 12; Marsh v. United States, supra.

At this juncture, it is most appropriate to consider relevant portions of the customs agents' testimony given at the trial before the magistrate. With respect to Agent Harrison's observations on the pier, and the events that transpired during the crucial time in question, his testimony on direct examination is illuminating; he testified, inter alia:

"Q   How did he [Beck] appear? Can you describe how he appeared? Picture in your mind—can you describe that factually to His Honor?

"A   Yes, sir. Well, he came out with the bag and *instead of the bag swinging as if it was light the bag appeared heavy.*

"Q   How was his arm?

"A   *His arm was straight. His arm wasn't swinging.*"

(N.T. pp. 7, 8) (Emphasis added).

\*     \*     \*     \*     \*     \*

On cross-examination, Agent Harrison testified in relevant part as follows:

"Q   How long did it take him to walk from where you first observed him to get into the car?

"A   How long a time, sir?

"Q   Yes.

"A   *Ten seconds, twenty seconds,* I don't know.

"Q   And about how large a portion of that did you observe his straight-on arm when he was walking along the back of the car?

"A   I don't follow your question, sir.

"Q   How was that ten or twenty seconds from the time you first observed him until the time you got into the car  .  .  .  that is, around the back of the car toward you?

"A   *Five seconds.*"

(N.T. p. 18) (Emphasis added).

\*     \*     \*     \*     \*     \*

On direct examination Agent Friedrich testified as follows with respect to his observations:

"Q   Would you describe to His Honor the manner in which these bags were carried?

"A   In the instance of Mr. Murray, *we had a very fast observation of him. It was a matter of seconds.* I imagine. *He was concealed.* The only observation I had of him was when he left the pier area, the main entrance, and within about five or six steps when he was blocked by the outline of his car. But Mr. Beck proceeded around the rear of the car which was directly in line with us and put his bag in the back seat of the car."

\*     \*     \*     \*     \*     \*

"Q   What if any motion was he [Beck] making with his arm that was carrying the bag?

"A   There was none.

"Q   To which side was he leaning, would you say?

"A   I'd say to his right.

"Q   And which side was he carrying the bag that you could see?

"A   I didn't have that good a description of the bag. My partner had the binoculars."

(N.T. pp. 24–25) (Emphasis added).

\*     \*     \*     \*     \*     \*

We must note that with respect to defendant Murray there was no testimony by the customs agents of anything unusual or suspicious about him personally or the manner in which he carried his bag. There was only a very fast observation of him. Accordingly, it would appear that, as to Murray, there are clearly no circumstances upon which to justify even a reasonable suspicion. A careful review and analysis of the evidence conclusively shows that only two circumstances presented could have possibly raised any inference of illegal activity: (1) the manner in which defendant Beck was walking and (2) the fact that his arm was straight and not swing-

ing. From these circumstances the agents concluded that the bags of both defendants were heavy and that accordingly the defendants were violating customs laws.

■ On the basis of the foregoing testimony, the government resourcefully argues that the agents had "reasonable suspicion" because they believed that it was unusual· for defendant Beck to be carrying his bag with his arm straight and not swinging. This argument is unpersuasive. Even assuming arguendo that the manner in which defendant Beck carried his bag was unusual, that fact standing alone or considered together with the proximity of the search to the border area, does not satisfy the constitutional requirement of reasonableness.

The government makes much of the customs agents testimony that there were foreign seamen in the area along the pier and that the latter might have given the defendants contraband. However, it is worth noting that there is no evidence that defendants were observed taking anything whatsoever from foreign seamen or that they had been in their presence or that the agents had any basis for such suspicion. We must stress that the mere hunch by the agents, unsupported by any facts, that defendants' bags might contain narcotics or merchandise which had not passed customs is insufficient to establish reasonableness under the circumstances of the instant case.

In support of its contention that there was reasonable suspicion to believe that customs laws were violated, the government lays great stress on the case of United States v. McGlone, supra, which seems to be the primary authority for allowing "border searches" of those who work on the docks. In United States v. McGlone, supra, officials found that 600 of 1000 transistor radios on which no duty had been paid were missing from a foreign shipment. The loss was dis-

covered while the ship was in the process of unloading. The officials suspected that longshoremen who had been unloading the ship, might have stolen the missing merchandise. Accordingly, a customs investigator stopped the defendant, a longshoreman, as he was leaving the pier area in his automobile. A search of his automobile and that of another longshoreman revealed some of the stolen merchandise. The court sustained the searches and seizures. We believe that the government's reliance on McGlone is misplaced. McGlone is distinguishable from the instant case in very important respects. The court in McGlone emphasized the factors which it deemed important in finding the search reasonable. Because of the disagreement of the parties with respect to the applicability of McGlone to the facts of this case, we set forth what we believe are the critical distinctions:

1. In McGlone, the customs investigator had actual knowledge that radios subject to duty were missing from a foreign vessel. Here, the customs officials had no such knowledge. Indeed, they had no reason to believe that any bonded merchandise from Pier 80 South had been taken illegally out of customs control.

2. In McGlone, the investigator, from the facts then known and from experience, suspected the longshoremen working on the ship. Here there is nothing in the record before us which would even suggest that the customs agents had any basis to suspect the defendants, who were watchmen, of pilfering from customs control. Their only suspicion arose from the manner in which the defendant Beck carried his tote bag, a type of bag customarily carried by longshoremen, watchmen and car-loaders.

3. In McGlone, the investigator confined his investigation to dutiable merchandise that was in fact missing from the ship. Such limited investigation could not have occurred here as the agents did not have any information of stolen goods from customs.

4. The investigator in *McGlone* did not conduct a general exploratory search for stolen goods merely to turn up wrongdoing not related to the customs laws. That is not our case. The attention of the customs agents was drawn to these defendants by the manner in which defendant Beck carried his bag. The agents did not observe anything being put into the trunk of defendants' car. Nevertheless, the trunk was the first place the agents began to search. What we have here appears to be a general exploratory search with the hope of finding incriminating evidence.

5. The search in *McGlone* was "limited to the enclosed guarded area adjacent to the pier, in which imported goods were customarily unloaded and in which those employed in loading and unloading operations were permitted to park." Clearly, this was not the situation here.

6. The search in *McGlone* was made immediately after discovery of the empty cartons and before the longshoremen left the area. Here, the search was made first and then the investigation was conducted to determine if the articles were stolen.

Based on the facts and circumstances in *McGlone* the court held that "the factors of time, place, and opportunity for smuggling, *together with the facts known to the investigator, established reasonable cause to suspect* that the defendants were introducing dutiable goods into the United States without the payment of customs." United States v. McGlone, supra, 394 F.2d at 79. (Emphasis added).

The Magistrate, in the course of his opinion, stated that United States v. Glaziou, supra, enunciated the proper rule that is applicable to the instant case. In *Glaziou*, customs agents, while patrolling the Brooklyn waterfront, stopped and searched two french seamen beside an enclosed pier after the agents had observed them proceeding out of the pier's gate. The agents knew that a foreign ship had recently docked, and were surveilling the area for possible illegal entries by foreign seamen. Glaziou, a french seaman, was observed leaving the area of the docked ship at a time not usual for seamen with valid authorization to enter the country. While requesting Glaziou to show his authorization to enter the country, the physical appearance of Glaziou led the officer to suspect he was carrying contraband and a search revealed a sizeable quantity of heroin. We do not deem the decision in *Glaziou* to be dispositive of the instant case. The facts in *Glaziou* are clearly distinguishable. For the same reason that it is proper to search travelers who enter this country from overseas, a search of foreign seamen is proper each time they leave the ship and enter the mainland. The search in *Glaziou* was sustained under its facts as a search of one entering the country and as such reasonable under the circumstances. We recognize that, in dicta, the Glaziou court stated that the class of persons subject to border searches included those persons who work in border areas, when leaving those areas.[13] Apparently, the magistrate construed this dicta as authority to apply the same standard to searches of employees in the border area as is applied to foreign seamen, and international travelers entering the United States. Certainly, the fact of defendants' employment should not give rise to an inference that customs laws are being violated, or subject them to unreasonable searches and seizures.

13. "The class of persons who may be subjected to a border search is not limited to those suspected persons who are searched for contraband upon first entering the United States. Also included in the class are persons who work in a border area when leaving the area; persons engaged in suspicious activity near a border area; and, in some situations, persons and vehicles after they have cleared an initial customs checkpoint and have entered the United States." 402 F.2d at 13.

**614**

Routine searches which are made of persons who are searched for contraband upon first entering the United States are not permissible as to persons who work on our piers, or who are just visiting or touring the border areas. A watchman is the proper subject of a valid search, just as any other person who has direct contact with the border area, only if all the facts and circumstances establish that the customs agents have a reasonable basis to believe that the person proposed to be searched is introducing contraband or goods subject to customs control in a manner contrary to customs laws. United States v. McGlone, supra.

■ We have found no case which would justify a search on the basis of the evidence before the Magistrate. The agents did not have knowledge of any customs laws violation; the defendants were watchmen, who were at a place where they had a right to be, in possession of bags customarily carried by workmen in the area. A fleeting five second observation by the agent that one defendant was not swinging his bag is insufficient to make the search reasonable. We cannot in good conscience condone the instant search; the potential for abuse is too great. To uphold the search would eliminate the protection afforded by the Fourth Amendment, and would sanction random searches of persons based only on employment or other invalid classifications. It is true that in this case the agents made a correct guess, and the search yielded contraband subject to the customs laws; however, it is clear that they acted only on a hunch or a guess, which is an insufficient basis to satisfy the reasonableness requirement of the Fourth Amendment.

Because the evidence should have been suppressed for the reasons set forth above, we reverse the convictions and sentences of defendants and remand to the Magistrate's Court for further proceedings consistent herewith.