UNITED STATES of America,
Appellee,

v.

Ralph ROSA, Defendant-Appellant.

No. 687, Docket 73-2324.

United States Court of Appeals,
Second Circuit.

Argued Jan. 18, 1974.

Decided March 26, 1974.

Richard A. Levy, New York City, for defendant-appellant.

Eugene F. Bannigan, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S.D.N.Y., John D. Gordan III, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY and MANSFIELD, Circuit Judges, and ZAMPANO, District Judge.*

MANSFIELD, Circuit Judge:

This appeal from a judgment of conviction entered after a jury trial before Judge Charles L. Brieant, Jr. in the Southern District of New York brings to us a narcotics case with a factual outline and charges familiar to all who regularly read these pages. Appellant Ralph Rosa and co-defendant Alphonso Beauchamp were convicted on a three-count indictment charging them with conspiring to distribute cocaine (21 U.S.C. § 846), possessing one-eighth of a kilogram of cocaine with intent to distribute (21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A)), and finally assaulting a federal agent (18 U.S.C. § 111). For the most part the evidence supporting these charges reveals what has become almost a stereotyped fact pattern. On an evening in February, 1973, William Simpson, a Special Agent of the Bureau of Narcotics and Dangerous Drugs, and Nat James, a government informant, met Rosa and Beauchamp at the latter's apartment for the closing of a narcotics sale. After some pleasantries Simpson quickly turned to business, asking Rosa if he had the cocaine. Rosa reported that he had only one-eighth of a kilogram, which was half of the agreed-upon amount, but that he could obtain it in 20 minutes. Brief negotiations over price followed, during which Rosa served as interpreter for Beauchamp, who spoke only Spanish. When Simpson and Beau-

* Of the United States District Court for the District of Connecticut, sitting by designation.

champ had finally agreed upon a price, Beauchamp left to pick up the remainder of the cocaine. Rosa, apparently a congenial host, offered Simpson and James some cocaine to taste while they awaited Beauchamp's return.

Upon Beauchamp's return Simpson weighed the cocaine, found to be 4½ ounces, and announced that he was going to his car for the cash needed to complete the transaction. Once outside Simpson met his fellow agents and advised them that the cocaine was inside, but cautioned that one of the men might be armed. All agents then returned to the apartment. Simpson knocked on the door. Rosa partially opened the door and, upon seeing the other men in the corridor, attempted to close it, whereupon the agents forced their way into the apartment. A melee ensued, with Rosa and the agents later offering conflicting versions of what occurred. The agents maintain that they met stiff resistance from Rosa, who grabbed Agent White's gun, and from Beauchamp. Rosa alleges that the agents pummelled him and Beauchamp without justification. Uncontested is the fact that Beauchamp, during the first moments of the raid, was in the bathroom seeking to flush away the government's evidence, i. e., the cocaine. When subdued, Rosa was taken by Agents Grant and Sennett to their car for immediate interrogation. The agents hoped to learn the source of the cocaine. Agent Grant testified that he advised Rosa of his rights and that Rosa said, "Look, you got me, my friend flushed it." Because a crowd of spectators was gathering outside the apartment, the agents continued their interrogation of Rosa as they drove around the neighborhood. After approximately an hour of mobile interrogation, the agents delivered Rosa to the headquarters of the Narcotics Bureau. There Rosa, according to the agents' testimony, admitted to Agent White that he had directed Beauchamp to flush the cocaine down the toilet. Traces of cocaine were found around the toilet and in the toilet water.

As might be expected in a case such as this, where the incriminating evidence is strong, the first line of defense is the suppression hearing. It is also the first source of alleged error. Rosa sought to suppress all his post-arrest statements on the grounds that he had not been advised of his *Miranda* rights and that he had been coerced into making the statements. At the suppression hearing Agents Grant and White testified that they had each warned Rosa of his rights, which Rosa acknowledged that he understood by nodding his head. Agent Grant went on to explain that they had conducted an immediate interrogation in an effort to induce Rosa to cooperate with them and reveal the location of his supplier, and that they then continued the interrogation in the cruising car because a crowd gathered when it was stopped.

Rosa took the stand to testify that the agents did not give him the *Miranda* warnings before interrogating him; instead they beat him in the back of the car as, he asserts, they had done earlier in the apartment. On cross-examination it was revealed that Rosa had two prior narcotics convictions as well as a conviction for attempted armed robbery.

■■ Following Rosa's testimony at the suppression hearing the judge and counsel for Rosa engaged in a colloquy that forms the basis for Rosa's first objection. In response to an admonition by counsel that the court should not assume that the "police do exactly what they say they do," the court said:

> "No, but I have to evaluate the credibility of witnesses on the entire record including their demeanor and everything else and I tell you right now that I don't believe your client as to most of what he has testified to."

Rosa objects that the judge thus improperly made a premature ruling without having heard all the evidence on the suppression motion. We cannot agree that this comment made by the judge *in medias res* amounted to a ruling, prema-

ture or not. On the contrary, Judge Brieant specifically advised that he was not making any ruling and that he was not going to dispose of the motion until he had heard and considered the remaining evidence.[1] Nor do we think that the judge's comment meant that he had as a practical matter prejudged the issues on the suppression hearing or foreclosed objective and intelligent consideration of all of the evidence. To suggest that a judge must be precluded from reaching even tentative impressions of credibility until the final moment of judgment is unrealistic. Although we expect a judge to render his decision on the basis of all the evidence, it does not usually spring full blown from Zeus' head. It is an evolving process in which he must tentatively register, albeit to himself, the impressions he forms of witnesses at the time when they furnish their testimony. The mere articulation of one of these impressions does not constitute a prejudgment or "a closed mind on the merits." See United States v. Grinnell Corp., 384 U.S. 563, 580–583, 86 S.Ct. 1698, 16 L. Ed.2d 778 (1966).

■ Rosa claims another instance of error in the court's refusal to order the government to produce as witnesses additional agents who had taken part in the appellant's arrest. The government had called as witnesses at the suppression hearing Agent Grant, who interrogated Rosa in the car, and Agent White, who interrogated him at headquarters later that night. Rosa had called as a defense witness Agent Sennett, who drove the car during the first interrogation. The testimony of all three agents was substantially the same as to the events of the evening. All testified that Rosa had been informed of his rights before he made his admissions and that he had not

been beaten or coerced. Agent White further testified that force had only been used against Rosa when he resisted arrest as the agents first entered the apartment. Despite the consistency of the agents' testimony and Rosa's concession that he expected any further testimony to be similar, Rosa maintained that he should be allowed to call still more government agents in the hope that he might develop some discrepancy in their stories. Noting that the testimony of Agent Sennett as a defense witness had corroborated the government's case and contradicted Rosa's allegations, the court denied the request. Rosa had made no showing that the testimony would be helpful. There was, therefore, every indication that the testimony of the other agents would be cumulative and contradictory of Rosa's story. In such a setting we cannot conclude that the court abused its discretion in ruling as it did. If counsel for Rosa had really required the testimony, he should have subpoenaed the agents before or during the course of the hearing and thereby avoided any dependence on the hearing judge's discretion.

■ Thus there was ample evidence to support the court's conclusion that Rosa was not beaten as he alleged; that he had been warned of his rights; and that he made a knowing waiver of those rights. Rosa does not seriously challenge these findings. Instead he mounts a less ambitious, though perhaps more colorful, attack upon the surrounding circumstances of his interrogation. He argues that he "was driven around to isolated places, late at night, alone with agents and handcuffed, for purposes of interrogation. These constituted plainly overbearing circumstances." While coercion might have been inferred

---

1. The evidence that remained to be adduced was of little assistance to Rosa. Indeed, it worked to contradict his story. Rosa called as a witness a federal agent who testified that Rosa had been informed of his rights before the interrogation. The medical records at the West Street jail where Rosa was delivered after his arrest and interroga-

tion indicate that he made no complaints about any beating when he was first admitted there on the night of his arrest. He only complained of the alleged beating the next morning, at which point he was examined but was found to have no discoloration or bruises.

in the absence of explanatory circumstances the government furnished plausible reasons for the agents' conduct. They already had a strong case against Rosa, regardless whether he should confess to his own guilt. However, they were obviously interested in apprehending Rosa's source, presumably someone higher up on the distribution ladder, located somewhere in the immediate vicinity of the arrest. They hoped Rosa would lead them promptly to that source before the supplier learned of the arrest and fled. To interrogate Rosa in Beauchamp's apartment would pose obvious risks. Furthermore the apartment was too small to permit simultaneous questioning of both Beauchamp and Rosa. The agents therefore decided to interrogate Rosa in their car and were forced to drive around the area after a crowd had gathered around the parked car. The agents made it clear to Rosa that they were interested in his cooperation in apprehending his source, not in his confession. The questions they posed concerned his supplier's identity and location. It cannot be said then that the circumstances of the car ride could reasonably convey even an *appearance* of coercion to Rosa.

**■** Finally, we face the allegation that the trial judge erred in his instruction to the jury. Through a *lapsus linguae* the court indicated at one point in its instructions that the "guilt or innocence" of the defendant should be determined beyond a reasonable doubt. Defense counsel, who alone seems to have detected the error at the time, asked the court for a curative instruction, which Judge Brieant declined because he thought it most improbable that he had misread his instruction. The wiser course would have been to have the court reporter read the minutes of the

crucial instruction or to instruct the jury that it should disregard any misstatement if one had occurred. This would have disposed of the problem with a minimum of disruption and delay. However, the court's failure to take these steps was hardly fatal. The inadvertent reference to "innocence" during this portion of the charge, though error, was harmless beyond any reasonable doubt. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Only moments before this slip the court had correctly instructed the jury on the burden of proof and presumption of innocence and repeated instructions as to these basic principles were flawless. It is inconceivable that the jury could have been misled by this solitary slip of the tongue in an otherwise accurate charge. See United States v. Glaziou, 402 F.2d 8, 18 (2d Cir. 1968), cert. denied, 393 U.S. 1121, 89 S. Ct. 999, 22 L.Ed.2d 126 (1969).

**■** As his second claim of error in the instruction, appellant cites the court's failure to give a requested charge on the subject of the "casual facilitator." There is no requirement that a court charge a jury in the language requested by a defendant. United States v. Sacco, 436 F.2d 780, 783 (2d Cir.), cert. denied 404 U.S. 834, 92 S.Ct. 116, 30 L.Ed.2d 64 (1971); United States v. Jackson, 390 F.2d 317, 319 (2d Cir.), cert. denied, 392 U.S. 935, 88 S.Ct. 2304, 20 L.Ed.2d 1394 (1968). The court's instruction that mere knowledge of the crime or mere presence at the site of the crime was not sufficient to support a conviction was both adequate and appropriate to the facts of this case. See United States v. Terrell, 474 F.2d 872, 876 (2d Cir. 1973).

The judgment is affirmed.